**FILED**

JUN 2 0 2008
JUN 30 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

United States of America ex rel. )
)
_JAN NEWELL – K-50566_ )
(Full name and prison number) )
(Include name under which convicted) )
)
PETITIONER )
)      08CV3711
vs. )      JUDGE DARRAH
)      MAGISTRATE JUDGE BROWN
_WARDEN NEDRA CHANDLER_ )
(Warden, Superintendent, or authorized )
person having custody of petitioner) )
)
RESPONDENT, and )
)
**(Fill in the following blank only if judgment** )
**attacked imposes a sentence to commence** )
**in the future)** )
)
ATTORNEY GENERAL OF THE STATE OF )      Case Number of State Court Conviction:
)
_____ )      _93-CR-19978_
(State where judgment entered) )

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: _COOK COUNTY CIRCUIT COURT, COOK COUNTY, IL., 2650 S. CALIFORNIA, CHICAGO, IL 60608_

2.  Date of judgment of conviction: _OCTOBER 28, 1996_

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
    _1ST DEGREE MURDER – CH.38 -9-1-A(1)_

4.  Sentence(s) imposed: _40 YRS_

5.  What was your plea? (Check one)    (A)  Not guilty    ( ✓ )
                                         (B)  Guilty       ( )
                                         (C)  Nolo contendere    ( )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

    _____

Revised:  7/20/05

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):     Jury ( )          Judge only ( ✓ )

2. Did you testify at trial?     YES ( ✓ )          NO     ( )

3. Did you appeal from the conviction or the sentence imposed? YES ( ✓ )  NO ( )

  (A) If you appealed, give the

    (1) Name of court:   _APPELLATE COURT OF ILLINOIS — FIRST DISTRICT_

    (2) Result:   _AFFIRMED_

    (3) Date of ruling:   _JULY 25, 1997_     (APPEAL NO. 1-96-4328)

    (4) Issues raised:   _EXCESSIVE SENTENCE IE. THAT SENTENCE WAS_
    _AN ABUSE OF DISCRETION BASED ON 40 YR. SENTENCE FOR 54 YR OLD_
 MAN WHO WAS PARALYZED CHEST DOWN, PARTIALLY PARALYZED LEFT ARM/HAND AS A RESULT OF
    _THESE EVENTS BEING CONSIDERED_
  (B) If you did not appeal, explain briefly why not:            (SEE ATTACHED)

    _____

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( ✓ )          NO ( )

  (A) If yes, give the

    (1) Result:   _DENIED LEAVE TO APPEAL_

    (2) Date of ruling:   _DEC. 3, 1997_

    (3) Issues raised:   _____

    _EXCESSIVE SENTENCE IE. THAT SENTENCE WAS AN_
    _ABUSE OF DISCRETION    (SEE ATTACHED )_

  (B) If no, why not:   _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )   No ( ✓ )

  If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

2                              Revised:  7/20/05

## CASE HISTORY (Con't)

only the issue of **excessive sentence** was addressed, none from Pro Se brf.

10. N/A

11. Yes, other applications, petitions were filed regarding restraint.

12. An application was made to the Illinois Supreme Court.

DENIED WITHOUT COMMENT-- December 3,1997

Issues raised:

a. 40 year sentence constituted abuse of discretion. Defendant is 54 years old and is paralyzed from the chest down and suffers severe nerve damage to left arm/hand as a result of the events being considered.

b. Ineffective assistance of trial counsel for:

(1) failure to call eyewitnesses on defendant's behalf,

(2) failure to investigate and use 911 tapes to establish time element of fight and shooting,

(3) failure to produce and use an eyewitness to testify to a shorter time frame than the one assumed by judge,

(4) failure to raise an intoxication defense,

(5) failure to present lost eyeglasses as an issue,

c. Ineffective assistance of appellate counsel (Ass't. Public Defender T.Shanker) for not raising the supplemental issues.

d. Appellate court was in error for not addressing the supplemental issues.

__ Other motions, petitions, requests filed or given notice of,

a. Motion for  transcripts and common law records--
    Denied  April 22, 1997,

b. Letter to State Appellate Defender Office protesting
    the handling of my case by the Asst.Public Defender
    George Nichols (Ineffectiveness of Counsel) --
    November 20, 1996,

c. Letter to Deputy Defender, M.J.Pelletier, requesting
    police reports,transcripts, postmortem, etc.before
    briefs are filed.  -- April 22, 1997,

d. Letter to  Forensic Clinical Services,  Dr. Stipes,
    requesting notes, reports and documents pertaining
    to my case to review for appeal --April 22,1997,

*handwritten margin notes: DIR. APPL. ISSUES ON PLA TO SUP. CT. →*

*ON DIR. APPEAL & NO CRIMINAL RECORD (I THINK) NOT SURE*

**PART II – COLLATERAL PROCEEDINGS**

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES (✓)  NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.  Name of court: _COOK COUNTY CIRCUIT COURT_

    B.  Date of filing: _MAY 30, 1998_

    C.  Issues raised:
        _— SEE POST-CONVICTION ISSUES (ATTACHED)_

    D.  Did you receive an evidentiary hearing on your petition?    YES ( )  NO (✓)

    E.  What was the court's ruling? _DENIED AS FRIVILOUS/PATENTLY WITHOUT MERIT_

    F.  Date of court's ruling: _JUNE 29, 1998_

    G.  Did you appeal from the ruling on your petition?    YES (✓)  NO ( )    _NOTE: APPELLATE COUNSEL ONLY RAISED ONE (1) ISSUE-SEE ATTACHED_

    H.  (a)  If yes, (1) what was the result? _AFFIRMED_    _(THIS WAS INEFFECTIVE ASSITANCE OF APPELLATE COUNSEL)_

        (2) date of decision: _JULY 6, 2000_

        (b)  If no, explain briefly why not: _____

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES (✓)  NO ( )    _(ISSUE RAISED WAS SAME AS APPELLATE ISSUE.)_

        (a)  If yes, (1) what was the result? _LEAVE TO APPEAL DENIED_

        (2) date of decision: _JUNE 29, 2001_

        (b)  If no, explain briefly why not: _____

    _NOTE: ALSO FILED AFTER APPELLATE COURTS' AFFIRMATION:_

    _1) MOTION FOR REHEARING — DENIED — AUG. 16, 2000_

    _2) MOTION TO FILE SUPPLEMENTAL BRIEF — DENIED — SEPT. 28, 2000_

    _3) MOTION TO RECONSIDER — DENIED — OCTOBER 12, 2000_

Revised: 7/20/05

*POST-CONVICTION ISSUES*

## IN THE
### CIRCUIT COURT OF COOK COUNTY
#### COOK JUDICIAL CIRCUIT

PEOPLE OF THE STATE OF ILLINOIS, )
     Plaintiff-Respondent    )
                                 )
v.                           )    NO. 93-CR-19978
                                 )
JAN NEWELL,              )
     Defendant-Petitioner.  )

### PETITION FOR POST-CONVICTION RELIEF

Now comes, Jan Newell, petitioner, pro se, and respectfully requests that the Court grant him relief, pursuant to 725 ILCS 5/122-1 et seq. Petitioner states as follows:

### BACKGROUND OF CASE

1. On July 28,1993, petitioner was involved in a shooting, and although shot himself, he was charged with murder.

2. On September 24,1993, petitioner was assigned Public Defender, George Nichols.

3. On October 22,1993, petitioner was arraigned and pled not guilty.

4. Shortly thereafter attorney Nichols came to the Oak Forest Hospital, to get petitioner's version of what happened. Petitioner told Mr. Nichols, he could not remember the events of the morning of July 28,1993.

5. Mr. Nichols agreed to investigate the event.

6. On October 26,1995, Judge Erickson ordered a fitness evaluation, at defense counsel's request.

7. On June 3,1996, a hearing was held and petitioner was found fit to stand trial, with medication.

8. On September 20,1996, petitioner proceeded to a bench trial in front of Judge Erickson and was found guilty of First Degree Murder.

9. On October 22,1996, petitioner was sentenced to 40 years, in the Department of Corrections.

10. Petitioner appealed, and on July 25,1997, his conviction was affirmed by the Illinois Appellate Court.

11. Petitioner requested leave to Appeal to the Illinois Supreme Court, which was denied on December 3,1997.

## FIRST ISSUE

12. Whether petitioner received a **full and fair** fitness hearing, due to defense counsel's failure to supply Court with information of petitioner's amnesia, physical and mental condition and synergistic affect of medication. ( Hearing consisted of fitness evaluation report being read by the psychiatrist )

### RELATED FACTS

13. On September 24,1993, Mr Nichols, Assistant Public Defender, was appointed to defend petitioner, Jan Newell.

14. Mr. Nichols agreed to investigate the shooting that took place on July 28,1993, involving petitioner, due to petitioner's inability to remember the events that took place that morning.

15. Petitioner had been hospitalized from September 24,1993 up to and through petitioner's fitness hearing, on June 3,1996, (almost 3 years).

15-a. S.H.A. 725 ILCS 5/104 21(a)(b) Require a **Full,Formal** hearing ; U.S.C.A. Const. Amend. 6, when medications are taken during trial and sentencing,and this is known by the court.

16. Petitioners physical state: T-5 (chest down paralysis) with loss of bladder,bowel control and severe nerve damage to left arm/ hand with severe back pain,spasms and constant medication.**(Exhibit- 1 )**

17. During petitioners hospital stay (pre-trial,trial,sentencing) his mental state was retrograde amnesia, while taking Valium, Elavil, Dantrium, Baclofin, Robaxin, Coumadinand Tylenol-3.

18. Mr. Nichols knew or should have known petitioner's exact **mental** and physical state, having access to his medical records.

19. Mr. Nichols knew or should have known that memory loss **alone** could be crucial for construction/presentation of a defense  thus providing the necessary framework for a fair trial.

20. Mr. Nichols, after requesting a fitness evaluation allowed an inadequate hearing,by standing silent to the above known facts and to the synergistic effects of combined medication, creating a sedated  and unemotional state of response effecting petitioner.

21. Mr. Nichols called no witnesses, introduced any expert or medical opinion, on behalf of petitioner, or evidence of amnesia.

22. The Court must determine, when faced with amnesia, that sufficient facts were **disclosed** to to petitioner through other available sources of information, to enable him a fair trial.


## SECOND ISSUE

23. Whether petitioner's jury waiver was **knowingly** and **voluntarily** made,when defense counsel promised petitioner that

a bench trial would produce Second Degree Murder conviction, and
10-15 year sentence. **That a decision of waiver of jury trial must
made with a understanding of the evidence, facts and defenses avail-
able.**

RELATED FACTS

24. Prior to trial Mr. Nichols told  petitioner, he talked
to a Brian McInterf, and that he would testify in support of the
sudden and intense passion requirement for Second Degree Murder.

25. On the day of the trial, Mr. Nichols told  petitioner,
that he talked to the State's Attorney and that he agreed, if
petitioner took a bench trial, the State would not rebut the
sudden and intense passion testimony of Brian McInterf, allowing
the mitigating factor to support Second Degree Murder.

26. Prior to trial Mr. Nichols talked to Mary Jane Knabosch,
and Norman Knabosch, by phone and told them that he had reached
an agreement with the State, that there would be a bench trial
with the mitigating factor of sudden and intense passion being
unrebutted by the State **(Exhibits- 2-4 )**

THIRD ISSUE

27. Whether defense counsel was ineffective for **refusing**
and/or **supressing** police reports, medical records, and witnesses
statements.

RELATED FACTS

28. Petitioner continuously requested, of Mr. Nichols, to
see the police reports, medical records, and witness statements
and Mr. Nichols told petitioner that the Judge said petitioner did
not

(-8-)

have constitutional right to copies of said records.

29. Petitioner's sister made the same request, and was told the samething. An affidavit could be obtained.

29. Petitioner required these documents, in order that he could reconstruct the events that took place on July 28,1993, and insure that he was receiving a full and fair hearing of all the facts and witness testimony, to be presented at his trial, due to his medical state of amnesia and being heavily medicated.

### FOURTH ISSUE

30. Whether defense counsel was ineffective for failure to impeach State's witnesses with physical evidence and expose State's known use of false testimony.

### RELATED FACTS

31. On September 20,1996, Stan Weliczko, was called as a witness on behalf of the State.

32. On direct examination, by the State, Mr. Weliczko testified Tr. (page A42 - line 14-16) "when he came up - came walking through the snow fence and walked up to Tony and pulled a gun out and shot him."

33. In a pretrial statement, made to and signed by the State, Mr. Weliczko states, "he heard a gun shot, looked up and saw the Hispanic guy fall down and the guy with brown glasses and shorts, with a gun in his hand in front of the Hispanic male." **(Exhibits 5-8)**

34. Mr. Nichols started to impeach Mr. Weliczko (page A50 - Tr. line 14-24) and suddenly stopped, allowing witness's false testimony to stand!!

 (9)

35. Mr. Jeff Adams also testified on behalf of the State.
His testimony was somewhat suspect due to his selective memory,
however, Mr. Adams testimony was/is in direct conflict with the
physical evidence:

(a) When the State asked what he (defendant) was doing,
Mr. Adams answered," Just standing toe to toe with him basically.
**Tr.**
Were they face to face? Yes."   (page  A 11 - lines 15-17 )

(b) When asked how far apart they were, Mr. Adams
testified " Oh maybe three " (indicating feet)
( Mr. Weliczko testified to a distance of: " I'd say three, four
**Tr.**
feet" ( page A44 - line 9 )

(c) When asked how he shot him, Mr. Adams testified that:
**Tr.**
" The defendant shot him in the chest point blank." (page A13 -line 6 )

## PHYSICAL EVIDENCE

The following physical evidence listed on the police reports
was not entered into evidence by the State or by Mr. Nichols,
thus preventing effective cross-examination of the State witnesses.
The opportunity of impeachment was severely compromised.

(1) Gunshot residue analysis of both victim and the
defendant did not indicate that either had fired a weapon, the
results were without an opinion.    **( Exhibit 9,10 )**

(2) No testing for GSR or powder burns on the victim was
indicated.

(3) Two guns were recovered from the crime scene but
only one was pictured as evidence. Both were inventoried. The
second gun was not listed as evidence. Why not?

( **🐷** ) (**(10)**)

**Weapon I** -  A Smith & Wesson, 5 shot revolver,

**( Exhibits  11-14)** 2 inch barrel, blue steel, no serial number

**Weapon II** -  A Iver-Johnson, 5 shot revolver,

**( Exhibit 15)**     chrome, 1½ inch barrel, serial no. 19938

(4) The bullet that killed the victim could not be positively

identified with either weapon.  **( Exhibits  16,17 )**

(5) No fingerprint evidence was found relating defendant or

victim to either weapon. Detective Bernatek also relates a conflicting

report     **( Exhibit  18)**

(6) Both victim and defendant are 5' 9" yet the trajectory

of the bullet was sharply upward path. The bullet went from **20 inches**

from the top of the head to lodge **14 inches** from the top of the

head and from **4 inches** to the right of the midline to **4 inches**

to the left of the midline, indicating a sharply sideways path,

showing the person was turned and facing away from the defendant,

or that **someone,other than the defendant** shot the victim from the

side. Another person was seen shooting at the defendant, other than

the one mentioned at trial. This was never investigated by Mr.

Nichols     **( Exhibits 19-22)** ( the bullet passed thru soft tissue,
thus there was no deflection )

The indications of upwards/sideways bullet path was left

out of the trial stipulation of Dr. Lifschultz. This denied valuable

cross examination evidence. The Judge was left with an inaccurate

picture of the shooting. This caused **severe** prejudice.

**(Exhibits  23-25)**
**25-A, 31,32**



-11-

(7) The police reports show that Mr.Adams said that the gun was in my right hand, making the bullet path even more important as to how the victim was facing   ( **Exhibit** 26 )

36. Mr. George Miller also testified for the State,that the victim was " not much more than an arm's length away " (page A57 - line  8 ).

37. The Judge had no choice but to convict the petioner of First Degree Murder, based on the testimony of these witnesses, who should have been impeached, if the defense counsel had not been guilty of ineffective assistance of counsel. It seems that counsel acted outside of the range of minimum need  of help to his client which is required.

### FIFTH ISSUE

Whether defense counsel was ineffective based on cumulative errors.

### RELATED FACTS

**Counsel failed to:**

(a) Investigate, interview witnesses, and otherwise prepare an ADEQUATE DEFENSE.  ( Such as an intoxication defense, where drunkeness may contribute to sudden and intense passion or mistaken self defense )
( **Exhibits**  27-29 )

(b) Supply police reports, medical record and witness depositions/ statements to the petitioner, who needed this information to help stimulate his memory, due to his amnesia;

-12-

(c) Investigate victim's background for evidence of criminal history, aggressiveness, violent character, and propensity to carry a gun. (Two guns were recovered from the crime scene);

(d) Failed to investigate where the second gun went to, whose gun it was and why wasn't it tested for possibility of being the murder weapon;

(e) Protecting petitioner's constitutional right to a jury trial by coercing him into having a bench trial on the false promise that the State had agreed to conviction of only Second Degree Murder;

(f) Begin trial with a proper foundation or direction to any particular defense strategy. Counselor's only defense was a group of random unsupported statements in his closing arguments.
**Tr.**
(pageA30 - line 13 thru pageA31 - line 6);

(g) Expose State's known use of false testimony;

(h) Impeach the State's witnesses based on expert testimony and the physical evidence which directly contradicted the witness testimony;

(i) Depose State's witnesses before the trial for the possibility of impeaching their testimony or at least knowing what their testimony was going to be.

(j) Argue and investigate victim's conviction of battery, with a sentence of 18 Mos. probation. This is important to determine who the aggressor was in the second fight.

## C O N C L U S I O N

Based on the foregoing facts, this Court must find that the petitioner's rights under the 5th, 6th and 14th Amendments of the State and U.S. Constitutions were violated, by defense counsel's ineffective representation and hence a fair trial.

WHEREFORE, petitioner prays that his Court will:

(i) Grant the petitioner a new trial;

(ii) Appoint a special Public Defender;

(iii) and any other relief it deems just and fair.

Respectfully submitted,

*Jan Newell*

Jan Newell, pro se
K-50566
2600 N. Brinton Ave
Dixon, Il 61021

## A F F I D A V I T

STATE OF ILLINOIS )
                   )  SS
COUNTY OF LEE      )

I, Jan Newell, being first duly sworn, depose and state that I am the maker of the foregoing Petition for Post-Conviction Relief, and the facts stated therein are true and correct to the best of my knowledge and belief.

*Jan Newell*

Jan Newell

SWORN AND SUBSCRIBED TO BEFORE ME
this 30th day of May, 1998.

NOTARY PUBLIC

"OFFICIAL SEAL"
NANCY L. SMITH
Notary Public, State of Illinois
My Commission Expires 04/14/99

(14)

*POST-CONVICTION ISSUED ON APPEAL & PLA TO SUP. CT.*

No. 98-2920

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| -vs- | ) | Indictment No. 93 CR 19978. |
| JAN NEWELL, | ) | Honorable David Erickson, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

**I. THE COURT ERRED IN DISMISSING JAN NEWELL'S POST-CONVICTION PETITION AS FRIVOLOUS AND PATENTLY WITHOUT MERIT WHERE MR. NEWELL ESTABLISHED THE GIST OF A MERITORIOUS CLAIM BY ALLEGING THAT HIS WAIVER OF RIGHT TO JURY WAS INVOLUNTARY BECAUSE HIS ATTORNEY FALSELY PROMISED HIM THAT HE WOULD BE CONVICTED OF SECOND DEGREE MURDER IF HE WAIVED THE JURY.**

The State first contends that this issue is waived. (State's Brief at 8)  Because the defendant filed a *pro-se* brief on appeal, the State contends, the defendant could have included this issue in that brief. (State's Brief at 8)  The State's does not cite any caselaw to support this position, and, in fact, caselaw is quite clear that direct appeals are limited to those issues that are supported by the record. *People v. McCarroll,* 10 Ill. App. 3d 249, 294 N.E.2d 52 (1st Dist

-15-

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( ✓ )        NO ( )

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1.   Nature of proceeding        RELIEF FROM FINAL JUDGEMENT – 5/2-1401

2.   Date petition filed        OCT. 21, 1998

3.   Ruling on the petition        DENIED AS "WITHOUT MERIT"    SEE ISSUES (ATTACHED)

4.   Date of ruling        JUNE 30, 2005        ALSO ISSUES ON APPEAL & PLA

5.   If you appealed, what was the ruling on appeal?        AFFIRMED

6.   Date of ruling on appeal        MAY 1, 2007

7.   If there was a further appeal, what was the ruling ?        PLA TO ILL. SUP. CT. – DENIED

8.   Date of ruling on appeal        SEPT. 26, 2007

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO ( ✓ )

A. If yes, give name of court, case title and case number: _____

_____

B. Did the court rule on your petition?  If so, state

(1)  Ruling:        _____

(2)   Date:        _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO ( ✓ )

If yes, explain: _____

_____

SEE: 1)   2-1401   <u>ATTACHED</u> ISSUES    ......

    2)    "    "    ON APPEAL

    3)    "    "    ON PLA TO ILL. SUPR. CT.

–16–

Revised:  7/20/05

2-1401 - ISSUES

2-1401. (PCSupp3. 2-81.) In his 2-1401 petition, Newell alleged, *inter alia*: 1) he did not receive a full and fair fitness hearing due to counsel's failure to supply the court with information regarding the defendant's amnesia and mental condition due to medication; 2) he did not knowingly and voluntarily waive his right to a jury trial where counsel promised the petitioner that a bench trial would result in a second degree murder conviction and a 10-15 year sentence, that a witness, Brian McInterf, would testify to the sudden and intense passion requirement, and that the State agreed not to rebut McInterf's testimony if the defendant took a bench trial; 3) ineffective assistance of counsel for refusing or suppressing police reports, medical records, and witness statements from the petitioner; 4) ineffective assistance of counsel for failing to use physical evidence to impeach witnesses or expose perjury; 5) "cumulative" errors, including counsel's failure to investigate an intoxication defense or other defenses, counsel's false promise of a second degree murder conviction, counsel's failure to impeach with expert and physical evidence; 6) the use of perjured testimony; 7) suppression of discovery materials and scientific and physical evidence from the defendant; 8) the denial of possible defenses or mitigation based on diminished capacity or intoxication, and the denial of crucial evidence accounting for memory loss, including a possible black out; 9) the failure to present various theories of self defense, including testimony by a witness identified in police reports; and 10) ineffective assistance of appellate counsel. (PCSupp3. 2-81.)

The circuit court, apparently believing that it lacked jurisdiction to rule on the 2-1401 petition while the appeal on Newell's post-conviction petition was pending, took the 2-1401 petition "off call," but did not actually dismiss the petition. (PC. 56-59.) Following the court's ruling, Newell filed a motion for leave to amend the 2-1401 petition, arguing, *inter alia*, that he had been denied access to evidence, was prevented

MoRE DETAILED 2-1401 ISSUES

7. On June 3, 1996, a hearing was held and petitioner was found fit to stand trial, with medication.

8. On September 20, 1996, petitioner proceeded to a bench trial in front of Judge Erickson and was found guilty of First Degree Murder on September 25, 1996

9. On October 22, 1996, petitioner was sentenced to 40 years, in the Department of Corrections.

10. Petitioner appealed, and on July 25, 1997, his conviction was affirmed by the Illinois Appellate Court.

11. Petitioner requested Leave to Appeal to the Illinois Supreme Court, which was denied on December 3, 1997.


## SUPPLEMENTAL ISSUES

1. That perjured testimony was used at trial to obtain the conviction;

2. That all discovery evidence was suppressed from petitioner from pre-trial thru direct appeal as a result of counsel ineffectiveness, prosecution non-disclosure ( Brady v. Maryland violation) or unavailability ( new evidence );

3. That petitioner and petitioner's family continued to request these materials before trial from counsel;

4. That material evidence was of a scientific and physical nature as per 725 ILCS 5/115-5.1 and are prima facie, was never presented to the court, and with the result that had this been done, the judge's decision would probably have been different all to the prejudice to the defendant;

5. That petitioner obtained a copy of these materials contained in police reports and discovery in August, 1997, after the appeal had been affirmed and thus this evidence was not of record.

6. That without this evidence being introduced the Judge was left to believe the State's version consisting entirely of witness testimony. The State produced no <u>physical evidence</u> in support of it's case as to weapon to fatal bullet, defendant to crime, etc.

7. That the three witnesses who claimed to have witnessed the actual shooting:  Jeff Adams-- his testimony (does not reflect the actual postmortem forensic evidence) of '<u>toe to toe, face to face</u> (EXHIBIT - E-23,31,32)
( Tr. A-11);        Stan Weliczko-- who ,it can be shown, testified to information opposite to his previous statement, thus committing perjury,        George Miller-- his testimony that the victim was <u>facing</u> defendant, when shot, is also, not reflective of the post- mortem evidence which was never before the court   (EXH E-23,31,32) ( Tr. A-57,line 7,8)

8. That petitioner was denied possible defenses or mitigation because facts were not produced at trial concerning petitioner's mental state. A. Diminished capacity /Intoxication--  Hospital Records:

Christ Hospital-- " upon arrival, the patient was intoxicated and somewhat confused". " Blood alcohol level was 213 mg/dl. Tox ( EXHIBIT E-27,28,29, screen was positive for amphetamines". ( petitioner will swear, under penalty of purjury, that he has never VOLUNTARILY taken amphetamines )

This level was ascertained at the emergency room shortly after the incident and after losing a large amount of blood and receiving diluting IV'S (EXHIBIT E-33). A blood alcohol of 213 mg/dl is also expressed as .213 BAC which a psychological expert could have testified that the level of mental impairment was extreme. This level is almost three (3) times the current legal intoxication standard OF 0.08 plus the synergistic (multiplying) effect of the drugs.  People v. Wright at 729, 94 Ill. Dec. 726, 488 N.E.2d 973. As previously mentioned, petitioner's ability to reason was severely compromised. Defendant was denied crucial

explanatory evidence to account for the memory loss. The ability to remember is often lost in a black-out and is symptomatic of extreme intoxication. Without investigating and presenting the substantial evidence petitioner was denied authentication of his memory loss.

9. That without all of the evidence being introduced at trial petitioner was prejudiced by a lack of impeaching cross-examination;

10. That there were several versions of the shooting which were not addressed. When self defense is properly raised, with evidence, the State must accept the burden proving guilt beyond a reasonable doubt.        VERSIONS: NEVER INVESTIGATED OR AT LEAST BROUGHT OUT

I.  [ Victim # 1--Deceased] 1)    V # 1  was in a fight with V # 2

    [ Victim # 2--Petitioner]     V # 1  tried to kick V # 2

                                  V # 1  pulled out a gun and shot V # 2
                          (or V # 2   "    "   "  "   "   "   V # 1)

                          ( EXHIBIT  E-30 )

II.  Victim: weight-- 195 lbs.

     Petitioner: weight-- 150 lbs.

   Rick Rodriguez--
     Eyewitness never investig-
   ated although listed in police
   reports
            (Exhibit  E-22, E-34 )

Sitting by <u>court</u> (volley ball) noticed a fight break out with Tony (fat guy) and skinny guy . I saw skinny  guy shoot at  __?__  & hit Tony. Skinny guy was running and shooting back and Gerry had a gun & fired skinny guy 4-5 times & fled.

III.  Detective Bernatek  --  ...person # 1 (deceased) shot unknown person # 2 (critical with GSWs to chest, <u>left arm</u> and back). Person # 1, was then shot by as yet unknown third person
                              (Exhibit  E-18)

   These multiple versions cast doubt on the state's theory of the shooting

10. ( cont.)  **When  there is evidence that the deceased was
attempting to kick the petitioner the path of the bullet was one
of self defense and brings in more doubt as to what happened.
None of this evidence was considered  in court and the lack of it
was prejudicial to the defendant's case. In People  v. Ellis (App.,
62 Ill. Dec. 882, 437 N.E.2d 409 ) a "lunge" at the defendant led
to a finding of voluntary manslaughter.**

      **What we find here is a person who was convicted of battery
( a violent crime ) who was on drugs and alcohol ⁰ ( Exhibit E-36)
who out weighed petitioner by 45 lbs., who had previously beat-up
and drop-kicked petitioner ( petitioner- multiple bruises, torn-up
knees, etc. (Tr. B-17,18)) ( Exhibit  E-30 )   Battery--18 mos. proba-**

                                          **tion.**

      **" we hold that when the theory of self-defense is raised, the
victim's agressive and violent character is relevant to show who was
the aggressor and the defendant may show it by appropriate evidence,
regardless of when he learned it." (Lynch, 104 Ill.2d at 200, 83 Ill.**

                       **Dec.598, 470 N.E. 2d 1018 )**

    This Lynch material is important/relevant in this case
because their are conflicting reports of who the aggressor was
**<u>at the time of the shooting</u>**.


    **11.  On appeal another another Asst. Public Defender, Todd
Shanker was appointed.**        A)  I received his letter describing
the appellate process asking for any input I had, ôn
Friday April 18, 1997. On Monday April 21, 1997, **3 days** later he
filed his brief. I had never received my transcripts. This was

                       -21-

ineffective assistance of counsel and a denial of my right of appeal. I sent extensive requests for assistance and for all necessary documents. See **Exhibits  I-X**   I sent in a pro se supplemental brief which **was GRANTED** on July 22, 1997 **and AFFIRMED** on July 25, 1997, only **3 days later.** The only issue  **was excessive sentence.** This was from his brief and was the only issue presented.

    11. **Witnesses listed on police reports were not called.**
**Specificaly Rick Rodriguez.**
                                   **(Exhibit E-36,37)**

-92-

2-1401 - <u>APPELLATE COURT</u> ISSUE

THE TRIAL COURT EXCEEDED ITS STATUTORY AUTHORITY AND
VIOLATED JAN NEWELL'S PROCEDURAL DUE PROCESS RIGHTS
BY SUMMARILY DISMISSING HIS *PRO SE* PETITION FOR RELIEF
FROM JUDGMENT PURSUANT TO SECTION 2-1401 OF THE CODE
OF CIVIL PROCEDURE.

2-1401 - <u>PLA TO ILL. SUP. CT.</u> ISSUE

THIS COURT SHOULD GRANT REVIEW TO RESOLVE THE
CONFLICT IN THE APPELLATE COURTS AS TO WHETHER A
PETITION FOR RELIEF FROM JUDGMENT FILED PURSUANT TO
SECTION 2-1401 MAY BE SUMMARILY DISMISSED, AND IF SUCH
DISMISSAL IS UNAUTHORIZED, WHETHER HARMLESS ERROR
MAY BE APPLIED.  IN THE ALTERNATIVE, THIS COURT SHOULD
HOLD THIS MATTER IN ABEYANCE PENDING THE RESOLUTION
OF *PEOPLE V. VINCENT*.

PETITION FOR WRIT OF HABEAS CORPUS

PERSON IN STATE CUSTODY

JAN NEWELL-K-50566
Dixon Corr.Cntr.
2600 N.Brinton
Dixon,IL  61021

I.

## CASE HISTORY

Jan NeweLL,pLaintiff,was convicted of 1st. Degree Murder pursuant to CH.38-9-1- A(1) in Cook County, case No.93CR19978. PLaintiff received a forty (40) year sentence. He was given a bencH trial. THe incident occurred on JuLy 28,1993.He was sentenced on October 22,1996. As of June 28,2008,He wiLL Have served 14 yrs.,11 Mos. of tHe sentence,By tHe Hearing date, weLL over 2/3^rds. of tHe sentence.He was born on 9/23/42 and is 64 yrs. oLd. Plaintiff outdate is July 14,2013.TriaL-2 days-Sept.20 and Sept.25.

### ALLEGED

a    After an altercation/fight,that plaintiff left the scene, returned and approached the person who I had the fight with and while standing toe-to-toe, face-to-face, from 3-4 ft. away, with the personss arms outstretched towards plaintiff, that plaintiff pulled a gun with his right hand and shot that person, Anthony RodЯguez, in his right chest. That I then turned and as I was leaving either dropped or threw down the gun to the ground in the parking lot. As I was leaving, another man pulled out a gun and shot me in the back. As a result, I was left paralyzed from the chest down (T-5) by being hit in the spine. Anthony RodЯguez was fatally injured. THe person wHo sHot me fLed tHe scene and tHrew His gun away. He was later questioned and reLeased witH no cHarges. Question--WHy wasn't His gun tested by tHe crime Lab. tecHnicians?

### PRE-TRIAL,TRIAL ,COUNSEL ( Ass't. PubLic Defender--George NicHols)

I don't want to try to relitigate my case but the ▬▬▬▬ instructions indicate a request for a " detailed " account, so I am including a discussion of the forensic evidence which I obtained after my direct appeal had been decided. This evidence was in discovery, which my P/D, George Nichols and my trial judge had not allowed me to see or to discuss. It was also never investigated or introduced at trial. My complete lack of knowledge of the criminal system was central to my conviction.

(24)

**PART III – PETITIONER'S CLAIMS**    *SEE HAND WRITTEN CLAIMS NUMBERED GROUNDS I-V, GROUNDS A-G*

1.    State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)    Ground one _____
        Supporting facts (tell your story briefly without citing cases or law):

*CLAIMS SECTION FOLLOWS WITH SUPPORT DOCUMENTATION*

(B)    Ground two _____
        Supporting facts:

(25)

Revised: 7/20/05

PETITIONERS CLAIMS

GROUND I - NEWELL PLEADS A "SUBSTANTIVE CLAIM" OF "ACTUAL/FACTUAL INNOCENCE", AS WELL AS, IN THE ALTERNATIVE TO A "PROCEDURAL" CLAIM OF "ACTUAL INNOCENCE TO OVERCOME PROCEDURAL DEFAULT OF ANY NON-EXHAUSTED CONSTITUTIONAL CLAIMS. FAILURE TO REVIEW WOULD RESULT IN A FUNDAMENTAL MISCARRAGE OF JUSTICE, THIS CLAIM IS PRESENTED, CUMULATIVELY, IN THE FOLLOWING ISSUES AND GROUNDS, NEWELL WAS DENIED HIS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AS GUARANTEED BY THE 6TH, 14TH AMENDMENTS & 5TH OF IN THE U.S. CONSTITUTION

GROUND II -                                                      = NEWELLS

CONSTITUTIONAL RIGHT TO A JURY TRIAL, WAS THE GIST OF A MERITORIOUS ISSUE PRECLUDING DENIAL OF HIS POST-CONVICTION WHERE HIS WAIVER OF RIGHT TO JURY WAS INVOLUNTARY BECAUSE HIS ATTORNEY FALSELY PROMISED HIM, PURSUANT TO AN AGREEMENT WITH THE STATE, THAT HE WOULD BE CONVICTED OF 2ND DEGREE MURDER, IF HE WAIVED THE JURY AT TRIAL.

TRIAL COUNSEL TOLD MY FAMILY THAT WE HAD A DEAL, MY SISTER SUBMITTED AN AFFIDAVIT, WHICH THE STATE ALLEGED WAS FORGED. ON THE STATE'S COPY & THE NOTARY STAMP WAS FADED.

AS NEW EVIDENCE I HAVE ENCLOSED ANOTHER ORIGINAL COPY WITH THE STATE & THE COURT'S ASSESSMENT. THIS IS A BETTER NOTARY STAMP. MY SISTER'S SIGNATURE WAS NOTARIZED AND ROUTINELY SIGNED HER HUSBAND'S NAME. I THINK (SEE ATTACHED) SHE HAD POWER OF ATTORNEY.

I HAVE ALSO ENCLOSED WHAT THE STATE'S COPY LOOKED LIKE. AS WELL AS MY SISTER'S SIGNATURE ON A PROMISSARY NOTE, ALSO NEW EVIDENCE. I RECENTLY FOUND THIS NEW EVIDENCE, AND REQUEST TO SUPPLEMENT THE RECORD & FOR REVIEW UNDER FUNDAMENTAL FAIRNESS.

(SUPPORTING DOCUMENTS FOLLOW)
NUMBERED -II-3-6, & AS A-G

J. NEWELL - K52366

CASE No. 93 CR 14478

INEFFECTIVE ASSISTANCE OF COUNSEL ~~ABOUT~~ BY NOT INTRODUCING EVIDENCE OF INNOCENCE AND CASE HISTORY OF INEFFECTIVE ASSISTANCE.

~~[blacked out]~~ **ISSUES:**

I. INEFFECTIVE ASSISTANCE OF COUNSEL

A. PRE-TRIAL —

ASST. PUBLIC DEFENDER - GEORGE NICHOLS:

✱ PT. **I**) WOULD NOT SHOW J. NEWELL (DEFENDANT) ANY INVESTIGATIVE PAPERWORK — DISCOVERY FROM THE STATE (POLICE REPORTS, POST-MORTEM, TOXICOLOGY, WITNESS STATEMENTS, REPORTS OF PHYSICAL EVIDENCE ETC.) COUNSEL SAID HE ASKED JUDGE ERICKSON, IN A VERBAL REQUEST, AND THE JUDGE SAID NO, DEFENDANT COULD NOT SEE ANY, I HAD REQUESTED THAT HE ASK THE JUDGE.

AT MY REQUEST →

2. MY FAMILY FOUND A WITNESS, BRIAN McINTUFF, WHO WOULD TESTIFY TO A 2-3 MIN. INTERVAL PERTAINING TO THE "TIME" I LEFT THE FIGHT, WHERE I GOT BEAT UP, UNTIL I RETURNED AND SHOT THE VICTIM". NICHOLS NEVER CONSIDERED THAT I HADN'T SHOT HIM.

"TIME" FACTOR
I WAS ~~IN A FIGHT~~ IN A FIGHT ↓ ALLEGEDLY LEFT, THEN RETURNED ↓ SHOT VICTIM

MR. NICHOLS HAD SAID THAT THE CASE ~~[blacked out]~~ WOULD BE 2ND DEGREE, ✱HE COULD ~~[blacked out]~~ ← GET THE "TIME" "FACTOR" DOWN, WITH A MAX. SENTENCE ~~[blacked out]~~ OF 10-15 YRS. (I WOULD DO ½ OF THAT AND WITH TIME SERVED WOULD BE HOME IN 2-4 YRS.)

~~[crossed out line]~~

NICHOLS BEST "TIME" WAS 20 MINUTES, WITH HIS INVESTIGATORS WHO HE HAD SAID HAD INTERVIEWED WITNESSES (BUT THE 20 MIN. WAS FROM THE POLICE REPORTS) HE DISCUSSED THIS WITH MY FAMILY.

MY SISTER
MY BROTHER-IN-LAW
MY COUSIN (A LAWYER)

HE SAID THE JUDGE "WAS AWARE OF MY PHYSICAL CONDITION AND AGE AND WE WOULD ~~[blacked out]~~ GET 2ND DEGREE IF I TOOK A BENCH TRIAL

2. MR. NICHOLS SAID HE WAS FINALLY ABLE TO GET AN ASST. ST. ATTORNEY ASSIGNED TO THE CASE WHO HE COULD "WORK WITH". ROBERT BERLIN

FOR THE YEAR BEFORE TRIAL I HAD REQUESTED FOR HIM TO FIND OUT WHAT THE STATE WANTED TO DO REGARDING A CONFERENCE OR DEAL (REQUESTED 402 CONF.)

[AT THIS POINT I ASSUMED THAT I HAD SHOT THE DECEASED] →

HE TOLD ME THAT (ONLY) THE STATE "AND DECEASES FAMILY, WANTED A CONVICTION, FOR THE RECORD, BUT THAT SINCE WE HAD A WITNESS, B. MCINTURF, THAT THE JUDGE WOULD HAVE SOMETHING TO "HANG HIS HAT ON" AND THE STATE, INSTEAD OF A CONFERENCE WOULD ESSENTIALLY "LAY DOWN ON THE CASE" THIS WAS THE AGREEMENT, FOR 2ND DEGREE. IF I TOOK ~ WE HAD THIS AGREEMENT, A BENCH TRIAL. HE NEVER DISCUSSED A JURY TRIAL WITH ME OR THE TACTICS/DIFFERENCES. I RELIED COMPLETELY ON HIS JUDGEMENT. AT NO TIME DID HE EVER DISCUSS POSSIBLE DEFENSES, EVIDENCE, HOSPITAL REPORTS, STIPULATIONS, ETC.

ABOUT 1 WEEK BEFORE TRIAL, AFTER MY SISTER HAD AGAIN COMPLAINED ABOUT NO PAPERWORK HE BROUGHT 2-3 PAGES OF NOTES MENTIONING MY GETTING BEAT UP, AND BIKER GANGS (MOTORCYCLE) — OUTLAWS AND HENCHMAN, BEING PRESENT AT THE TIME OF THE CRIME. HE SPENT AT MOST 10 MINUTES. HE SEEMED SURPRISED AT WHAT WAS IN THE NOTES, LIKE HE HAD NEVER READ THEM BEFORE. HE SAID WHO KNOWS, MAYBE IT WAS SELF DEFENSE. "THOSE GANGS HAVE A REPUTATION FOR VIOLENCE." (THIS WAS 3 YRS. AFTER THE SHOOTING)

3. ON FRI SEPT 20, 1996 WHILE I WAS WAITING, **HE SAID** IN THE COURTROOM WAITING CELL, A THAT HE TRIED TO FIND B. MCINTURF ON WED SEPT. 18, BUT THAT HE HAD MOVED. HE HADN'T TALKED TO HIM FOR 8-12 MOS. HE DECIDED TO START THE TRIAL WITH THE INTENTION OF FINDING, MY WITNESS, LATER **SINCE THE STATE WAS READY (ON S. 20, 1996)** **was presented with** ~~BENCH TRIAL~~

**BENCH TRIAL**

WE BEGAN TRIAL ^ AND I ~~____~~ A JURY WAIVER **WHICH I SIGNED.**

**NOTE: PRIOR TO TRIAL MR NICHOLS HAD NEVER MENTIONED A JURY WAIVER OR MY RIGHTS**

" . THE STATE PRESENTED FIVE OCCURRENCE WITNESSES AND THE CASE WAS CONTINUED UNTIL WED., SEPT. 25, 1996 WITH THE EXPECTATIONS OF BRINGING IN MCINTURF. THE STATE -( **ASST. STS. ATTY.** MR. BERLIN) STATED (IN THE TRANSCRIPTS) THAT "MR. NICHOLS HAS A WITNESS WHO COULDN'T BE HERE TODAY" ( MR. BERLIN ACKNOWLEDGED THIS ON SEPT. 20, AFTER THE WAIVER OF JURY AND WITNESS TESTIMONY ) MR. BERLIN SAID " WE TALKED" REFERRING TO B. MCINTURF. (TR - A - 71) **&** AND THE DEAL.

4. MY FAMILY LOCATED MCINTURF OVER THE WEEKEND AND ^ **MR. NICHOLS DID NOT** ~~____~~ BRING HIM TO TESTIFY. ( MCINTURF **HAD** REFUSED TO TESTIFY ~~____~~ IT HAD BEEN TOO LONG SINCE NICHOLS CONTACTED HIM. ~~____~~ , MR. NICHOLS ASKED MY FAMILY IF ANYONE OF MY FRIENDS COULD TESTIFY, FEELING THAT HE NEEDED SOME **TYPE** OF **WITNESS** ~~____~~, BUT THE WITNESS, JOHN PIVORUNIAS, SERVED ONLY AS A CHARACTER WITNESS. WHY WOULD HE TESTIFY AT TRIAL AS A DEFENSE WITNESS? ( **ANSWER:** TO COVER ~~____~~ HIS PROMISE TO PRODUCE A WITNESS HE ~~____~~ [ ~~____~~ ]

**A FRIEND OF MINE** → **(TR AT B-23)**

**II**

[ IMPORTANT: CNSL STARTED CASE ON FRI. WITHOUT OUR WITNESS.
SAID HE WOULD BE FOUND OVER WEEKEND - NEVER GOT WITNESS.
CHANGED TO SELF DEFENSE WITHOUT MY INPUT ( I NEVER
SAID, I SHOT ANYONE.

QUESTION: BY
Ø. PLEADING SELF-
DEFENSE DIDN'T
HE AGREE THAT
I DID IT?

5) IT WAS AT THIS POINT THAT MR. NICHOLS
DECIDED ON HIS DEFENSE CHANGE. HE NEVER DISCUSSED
A NEW STRATEGY OF SELF DEFENSE, BUT AT TRIAL THAT
IS WHAT HE DID.  HE COMMENTED QUOTE, " THESE WITNESSES
SEEM MORE CREDIBLE THAN I THOUGHT THEY WOULD BE",
INDICATING THAT HE HAD NEVER INVESTIGATED THEM.

6) MR. NICHOLS LACK OF PREPARATION WAS APPARENT IN
HIS CURSORY CROSS-EXAMINATION AND ~~ATTEMPTED~~ WITNESS

TR AT B-17,18,9)

IMPEACHMENT.  + ABANDONMENT, of HE SUPPLIED NO FOUNDATION. PROPER
PROCEDURE WOULD BE TO PLACE THE POLICE, OFFICERS,
DETECTIVES OR INVESTIGATORS ON THE STAND ~~~~
TO TESTIFY AS TO THEIR NOTES OR STATEMENTS TAKEN
FROM THE WITNESSES, AND THEN TO CONFRONT THE WITNESSES.

He began ~~cross-x~~ then stopped and abandoned the impeachment
                                                        TR. at

THE STATE PRESENTED 5 WITNESSES:

   3 — WHO ALLEGEDLY SAW THE SHOOTING

   2 — WHO SAID THEY SAW ME BY MY CAR

( THE SHOOTING)

Of the 3 — one (STAN W.) said he didn't see it
in his statement + in pol. rpts but at trial
he said he did see it - This was the witness
Judge Erickson said was the most credible and
believable and who he based the conviction on as the most credible
witness (TR at B-35)

*STATES COPY*

KNABUSCH between the year 1994 until the **trial date of September,**
**1996** - up to the **first day of trial.**


_____        _____
MARY JANE KNABUSCH                          NORMAN KNABUSCH



SUBSCRIBED and SWORN TO

 before me this_____

**day** of NOVEMBER, 1997


_____

NOTARY PUBLIC




-A-

*FILED IN: STATES BRIEF & ARGUMENT ON POST SCONV APPEAL*

be proportionate to the manner in which the accused retaliates, and where a
defendant's retaliation is disproportionate to the victim's provocation, the
crime committed is murder, not manslaughter, especially if the defendant
accomplishes the offense with a deadly weapon. <u>People v. Pugh</u>, 187 Ill. App.
3d 860, 868, 543 N.E.2d 875 (1st Dist. 1989) Furthermore, in light of the number
and quality of the witnesses presented by the People, including witnesses with
no grudge against or even acquaintance with defendant, and including a witness
unacquainted with either the victim or defendant, who established beyond any
doubt that the murder was cold-blooded, there is no question that the finding
of guilty of murder was justified by the evidence.

It should be noted that Brian McInterf was not presented as a witness
for the defense. Therefore, there would be no reason for the assistant state's
attorneys to agree to forego rebuttal of his testimony. Furthermore, the
concept that assistant state's attorneys, going through a trial, would agree
to abandon available rebuttal defies logic. If the People agreed not to rebut,
it was because they recognized that the testimony of Brian McInterf would not
have supported a finding on the lesser-included offense of second degree
murder.

*NOTE:*

Defendant's allegation that his jury waiver was involuntary suffers
from the same infirmities. Defendants points out that enclosed with his
petition is the affidavit of his sister, Mary Jane Knabusch, declaring that she
also heard this alleged promise "more than one" [sic]. (R. C43) Defendant's

representation is incomplete.  The affidavit of his sister includes that his brother-in-law was also privy to these conversations.  Perhaps defendant's disinclination to mention Norman Knabusch's representations is either that he and his wife sign their names with the same distinctive "K" or "Norman" Knabusch accidently misspelled his name, which appears on the affidavit as "Norma".  Norman and Mary Jane  (or Mary Jan as it appears on the affidavit, which also happens to be defendant's first name) also apparently spell "Knabusch" differently.

In any event, the affidavits of defendant and his sister are self-serving and unsupported by any other evidence, unlike the case in People v. Algee, 228 Ill. App. 3d 401, 591 N.E.2d 1001 (5th Dist. 1992), to which defendant cites.   There, defense counsel admitted to denying defendant discovery, refusing defendant's telephone calls, hanging up on defendant after telling him he was not going to "Hold his g-damn hand", being unprepared for trial because he believed the People would be requesting a continuance and telling defendant that if he did not accept the offered plea, the judge would "unload" on him, which, while not  in total agreement with witnesses, supported their statements that they heard defense counsel tell defendant that he would be sentenced to 120 years on his drug charges if he failed to plead guilty.

The case at bar more closely resembles People v. Maxwell, 173 Ill. 2d 102, 670 N.E.2d 679 (1996).  Maxwell alleged, as does defendant, that his jury waiver for sentencing was the result of a misrepresentation by counsel that a

𝕇 -𝓬-

*APPELLATE COURT ORDER on P/C - 7/06/00*

1-98-2920

made because his attorney falsely promised him that the State had

agreed with defense counsel that if defendant opted for a bench

trial, he would be convicted of second-degree murder and be

sentenced to no more than 15 years in prison. He relies on the

affidavits of his family members to support his claim and their

assertion about McInturf's statement which defendant asserts

would have shown that defendant acted under a sudden and intense

passion. Defendant says that on this basis he waived a jury

trial, but McInturf did not testify. He concludes that he

presented the gist of a meritorious constitutional claim

precluding summary dismissal of his petition.

*Note:*    In reply, the State attacks the factual significance of

McInturf's statements given the other evidence against defendant.

The State also questions the authenticity of the joint affidavit

provided by defendant's sister and brother-in-law, and it

characterizes the affidavit as self-serving and unsupported by

other evidence.

We review defendant's allegations de novo. People v.

Coleman, 183 Ill. 2d 366, 388-89 (1998). As the supreme court

stated in Coleman, "At the dismissal stage of a post-conviction

proceeding, all well-pleaded facts that are not positively

rebutted by the original trial record are to be taken as true."

Coleman, 183 Ill. 2d at 385. Further, to withstand summary

dismissal, as here, defendant's pro se petition need only set

- d -

ORIE

STATE OF ILLINOIS          )
                           )  SS
COUNTY OF COOK             )


# A F F I D A V I T

MARY JANE KNABUSCH, being first duly sworn on her oath

and says as follows:

1. That she is the sister of JAN B. NEWELL.

2. That sometime in the summer and early fall of 1996,
before the trial of JAN B. NEWELL commenced, that Mr. GEORGE
NICHOLS , Asst. Public Defender, discussed MR. NEWELL'S case with
her and her husband, NORMAN KNABUSCH.  This was by telephone and
occurred more than one.

3. That in those conversations, MR. NICHOLS stated, "JAN
NEWELL"was told to take a bench trial - and the court would find
him guilty of second degree murder.

4. MR. NEWELL was told that there was an agreement
between the State and the P.D.'s office where he would get a
conviction and serve only 2 to 4 years of incarceration.

5. That in conversation (telephoned) with JAN B.
NEWELL'S attorney (P.D. GEORGE NICHOLS), from 1994 through
September, 1996 he was promised second degree if he took a bench
trial.

6. That all of these telephone conversations were made
between P.D. GEORGE NICHOLS and MARY JANE KNABUSCH and NORMAN

-E-

KNABUSCH between the year 1994 until the trial date of September, 1996 - up to the first day of trial.


_MARY JANE KNABUSCH_          _NORMAN KNABUSCH_


SUBSCRIBED and SWORN TO

before me this ___2(4___

day of NOVEMBER, 1997

_____

NOTARY PUBLIC

~F~

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal $10,000.00 | Loan Date 01-11-2000 | Maturity 01-20-2005 | Loan No 797958 | Call 6B | Collateral | Account | Officer 222 | Initials |
|---|---|---|---|---|---|---|---|---|

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Jane Knabusch (SSN: 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)
14229 Cottage Grove Avenue
Dolton, IL 60419

**Lender:** South Holland Trust & Savings Bank
16178 South Park Ave.
South Holland, IL 60473-1524
(708) 333-2600

**LOAN TYPE.** This is a Fixed Rate (8.500%) Disclosable Loan to an Individual for $10,000.00 due on January 20, 2005.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☒ Personal, Family, or Household Purposes or Personal Investment.

☐ Business.

**DISBURSEMENT INSTRUCTIONS.** I understand that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $10,000.00 as follows:

| | |
|---|---|
| Amount paid to others on my behalf: | $10,000.00 |
|    $10,000.00 to Jane Knabusch | |
| Note Principal: | $10,000.00 |

**FINANCIAL CONDITION.** BY SIGNING THIS AUTHORIZATION, I REPRESENT AND WARRANT TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN MY FINANCIAL CONDITION AS DISCLOSED IN MY MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED JANUARY 11, 2000.

**BORROWER:**

X _____
Jane Knabusch, Individually

---

## CREDIT INSURANCE DISCLOSURE

**VOLUNTARY CREDIT INSURANCE.** CREDIT LIFE INSURANCE AND CREDIT DISABILITY INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT.

☒ By signing below, I acknowledge that I am not obtaining credit insurance for this loan for one of the following reasons: (A) I am not eligible for credit insurance; (B) Credit insurance is not available from Lender; or (C) if I am eligible and credit insurance is available from Lender, I do not want it.

Prior to signing this Credit Insurance Notice on January 11, 2000, I read and understood all of the provisions of this Disclosure.

**BORROWER:**

X _____
Jane Knabusch, Individually

LASER PRO Lending, Reg. U.S. Pat. & T.M. Off., Ver. 5.11.00.08 (c) 1997.2000 CFI ProServices, Inc. All Rights Reserved. - IL c:\CFI\LPL\I20.FC TR-1184 PR-PERSCONSI

~ G ~

CLAIMS

GROUND III — WHETHER NEWELL RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL BEFORE TRIAL, DURING TRIAL, DURING THE PENALTY PHASE, ON DIRECT APPEAL AND ON POST-CONVICTION PROCEEDINGS AND POST-CONVICTION APPEAL.

NEWELL CLAIMS THAT HIS COUNSELS' TRIAL AND APPELLATE PERFORMANCE AMOUNTED TO DENIAL OF HIS 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. HE IS CLAIMING MANY DEFICIENCIES. THEY ARE LISTED HEREIN AS GROUNDS A — G ( GROUNDS A-G ARE SUB GROUNDS UNDER GROUND III )

GROUND A + GROUND B ARE GROUPED TOGETHER FOR EASE OF DISCUSSION

GROUND A — COUNSEL DID NOT CONDUCT A THOROUGH INVESTIGATION OF FACTS SURROUNDING THE CHARGE + POSSIBLE DEFENSES,

GROUND B — COUNSEL FAILED TO ADEQUATELY PREPARE FOR TRIAL.

NEWELL ALLEGES THAT COUNSEL 1) DID NOT OBTAIN AN INVESTIGATOR TO DISCOVER MITIGATION FACTS, AN INDEPENDENT BALLISTICS/FORENSICS EXPERT TO EXAM THE FATAL BULLET, VICTIMS WOUND;
                                    2) FAILED TO INVESTIGATE/PRESENT MATERIAL PRIMA FACIE EVIDENCE AVAILABLE AS LAB REPORTS, POLICE STREET NOTES, CRIME SCENE TECHNICIAN REPORTS, HOSPITAL RECORDS, ETC.
AS A RESULT, COUNSEL HAD NO THEORY OF DEFENSE AND THAT HE WAS UNPREPARED FOR EFFECTIVE CROSS-X ,— 3 FILED IN-ADEQUATE OR NO PRE-TRIAL MOTIONS AND WAS DEFICIENT IN BOTH THE GUILT AND PENALTY PHASE OF THE TRIAL, ALL TO THE PREJUDICE OF NEWELL, WITH THE RESULT THAT HAD THESE MATERIALS/EVIDENCE BEEN PRESENTED AT TRIAL THE TRIAL OUTCOME WOULD HAVE BEEN DIFFERENT.

SEE TESTIMONY + CROSS-X
            DETECTIVE BASIN — TR at B-3, B-9
            DETECTIVE BERNATEK — TR AT B-13, B-17

        ( SUPPORTING DOCUMENTS FOLLOW )
            NUMBERED III - 1,2

J. NEWELL - K50566
CASE NO. 93CR19928

*CUMULATIVE INEFFECTIVENESS OF COUNSEL BY NOT*
*INTRODUCING EVIDENCE OF INNOCENCE/GUILT (MATERIALLY IMPORTANT)*

## ARGUMENT III

(SECT. II·①)  **THAT DIRECT AND MATERIAL PHYSICAL EVIDENCE WAS NOT PRESENTED TO THE COURT, AT PETITIONER'S TRIAL, AND HAD THAT BEEN DONE THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT, ALL TO THE PREJUDICE OF THE PETITIONER** *I WAS NEVER SHOWN DISCOVERY*

At trial the State presented eyewitness testimony. There was no physical evidence presented which linked the petitioner/defendant to any weapon.

The eyewitnesses testified to a **face-to-face, toe-to-toe** confrontation where the deceased had his arms outstretched with the palms up. The defendant was said to approach the deceased and from **3-4 feet away**, pull a gun with his right hand, raise it up to the deceased's chest and shoot him point blank in the chest.

POST MORTEM REPORT --    there was a **stipulation** to the report

*I NEVER AGREED TO OR KNEW THAT A STIPULATION WAS TO BE GIVEN*

that the fatal bullet entered 20" from the top of the head and 4" to the **right** of the midline. The path was from front to back and right to left and that a medium caliber bullet was recovered from beneath the skin of the left back.

*I NEVER AGREED TO STIP*

The path was indicated to be through all soft tissue. There was no fracture of the ribs or long bones. (*SEE ACTUAL REPORT SECT III*)

HOWEVER, because there was a stipulation, the court did not hear that the bullet was found 14" from the top of the head and 4" to the **left** of the midline, i.e. the trajectory was severely upwards and sideways. *(ON THE SKIN CAUSED BY BULLET ENTRY)*

*AND* In addition there was a **margin of abrasion** from 7-11 o'clock, of 1/8th. in. *ON AN ENTRY*

WOUND of $\frac{3}{4}$" BY $\frac{3}{8}$"



(*SEE SECT. III, PG. 16*)

The bullet had to enter from the right of the deceased.

Based on the eyewitness testimony, the defendant could not have twisted his hand or reached far enough to his left to achieve the path of the bullet as indicated in the post-mortem report.

CRIME LABORATORY
FIRED EVIDENCE REPORT--    **EVIDENCE NOT INTRODUCED AT TRIAL**
there was a fired evidence report indicating that the fatal bullet could not be identified with the alleged murder weapon. In fact there was evidence

-4-

**EVIDENCE NOT INTRODUCED AT TRIAL (cont.)**

Ⅱ-2

of <u>another gun found at the scene,which was the same caliber</u> as-the alleged murder weapon. There was evidence of other fired bullets found at the scene.

CRITICAL EVID
↓
FATAL BULLET HAD TO
HIT A HARD OBJECT/SURFACE
BEFORE STRIKING DECMSD
PNSMSD " MY LFT.ARM
NEVER INVESTIGATED

**NOTE:** For the fatal bullet to have been so damaged that that it was not suitable for comparison, it had to hit something. However,the path of the bullet was through soft tissue. There were no fractures of the ribs or long bones.  If the bullet had been deflected off of a rib, in accounting for the upwards path, that would not account for enough damage so as not to be able to be identified with any specific weapon

<u>CRIME LABORATORY</u>  (GSR)

<u>GUNSHOT RESIDUE TESTS</u>-- both the deceased and the defendant were administered GSR tets. Both were inconclusive. For both to have been given the test there had to be doubt as to the actual shooting. There were detective notes indicating that the <u>deceased</u> shot the defendant first.

<u>FINGERPRINTS</u>-- there were no fingerprints found on the alleged murder weapon (NOT SU, DID THEY TEST BOTH WEAPONS?) (NO INDICATION)

Trial testimony was that from **3'-4'** while facing the deceased with his hands outstretched, that the defendant shot him, turned and after a short distance through away the gun.

What happened to the GSR and the fingerprints?

No -- <u>DIMINISHED CAPACITY DEFENSE</u> -- emergency room testing showed

NEVER BROUGHT UP.
I FOUND OUT WHEN MY SISTER
GOT MY MEDICAL RECORDS AFTER
DIRECT APPEAL WAS DENIED.

that defendant had a blood alcohol level of .213 mg/dl with a positive for amphetamines. .213 is more that 2.5 times the legal limit and was taken about an hour after the shooting and after many diluting IV's

That Judge Erickson and appointed counsel refused to show Defendant any evidence, discovery or crime lab. reports prior to trial. Defendant obtained the evidence after the direct appeal process ended.

GROUND - C —    COUNSEL FAILED TO ADEQUATELY CONSULT WITH HIS CLIENT
TO FULLY INFORM HIM ON IMPORTANT ISSUES AND DECISIONS INCLUDING
ADVANTAGES AND DISADVANTAGES OF: 1) NEVER DISCUSSED THAT BY COUNSEL
ALLEGING SELF DEFENSE AS A THEORY OF DEFENSE THAN NEWELL
WOULD BE ADMITTING THAT HE SHOT THE DECEASED AND so ADMITTING TO
MURDER. NEWELL HAD STATED, FROM THE ～～～ ～ - BEGINING THAT
HE DID NOT REMEMBER FIRING A WEAPON OR SHOOTING THE DECEASED;

2) STIPULATIONS;

3) JURY WAIVER;

4) TESTIFYING ON HIS OWN BEHALF;

COUNSEL PLACED NEWELL ON THE STAND WITH NO PREPARATION. ONLY
TO SAY THAT NEWELL HAD NO MEMORY OF THE SHOOTING WITHOUT ANY
REASON FOR MEMORY LOSS, HAVING NEVER INVESTIGATED/DISCOVERED
so THE MEDICAL RECORDS SHOWING THAT NEWELL WAS SEVERELY
INTOXICATED, CONFUSED, INCOHERENT WITH A BLOOD LEVEL OF .213
WHERE .08 IS ACCEPTED AS IMPAIRED AND THAT THIS LEVEL WAS
AFTER DILUTING IV's AND OVER AN A PERIOD OF TIME AFTER BEING
SHOT. COUNSEL FAILE TO DEVELOPE/INVESTIGATE/PRESENT A DIMINISHED
CAPACITY DEFENSE OR IN THE LEAST TO PRESENT IT AT SENTENCING
FOR MITIGATION.                    (TR- AT B-27)

(SUPPORTING DOCUMENTS FOLLOW)
NUMBERED   II - 10, 11

6. That without this evidence being introduced the Judge was left to believe the State's version consisting entirely of witness testimony. The State produced no <u>physical evidence</u> in support of it's case·as to weapon to fatal bullet,defendant to crime, etc.

7. That the three witnesses who claimed to have witnessed the actual shooting: Jeff Adams-- his testimony (does not reflect the actual postmortem forensic evidence) of <u>'toe to toe, face to face</u>
(EXHIBIT - E-23,31,32)
( Tr. A-11);        Stan Weliczko-- who ,it can be shown, testified to information opposite to his previous statement, thus committing perjury,        George Miller-- his testimony that the victim was <u>facing</u> defendant, when shot, is also, not reflective of the post-
(EXH- E-23,31,32)
mortem evidence which was never before the court  ( Tr. A-57,line 7,8)

8. That petitioner was denied possible defenses or mitigation because facts were not produced at trial concerning petitioner's mental state.  A. Diminished capacity /Intoxication--  Hospital Records:

Christ Hospital-- " upon arrival, the patient was intoxicated and somewhat confused". " **Blood alcohol level was 213 mg/dl**. Tox
( EXHIBIT E-27,28,29,
screen was **positive** for **amphetamines**". ( petitioner will swear, under penalty of purjury, that he has never voluntary taken amphetamines )

This level was ascertained at the emergency room shortly after the incident and after losing a large amount of blood and receiving diluting IV'S **(EXHIBIT E-33)**. A blood alcohol of 213 mg/dl is also expressed as .213 BAC which a psychological expert could have testified that the level of mental impairment was extreme. This level is almost three (3) times the current legal intoxication standard **OF 0.08** plus the synergistic (multiplying) effect of the drugs.  **People v. Wright at 729, 94 Ill. Dec. 726, 488 N.E.2d 973.** As previously mentioned,petitioner's ability to reason was severely compromised.Defendant was denied crucial

EHS ⊕ Christ Hospital and Medical Center

*E 27*

*(II - 11)*

*J. NEWELL - K-50566*
*CASE No: 93 CR 19978*

## DISCHARGE SUMMARY

NEWELL, JAN
MR #0513316

ADMISSION DATE:          07/28/93  DISCHARGE DATE:          08/18/93

PRINCIPAL DIAGNOSIS:        Gunshot wound to the chest.

FINAL DIAGNOSIS:            T5 fracture, open cord injury and
                            respiratory failure.

SECONDARY DIAGNOSIS:        Open radial shaft fracture.
                            Hemo- pneumothorax.
                            ETOH intoxication.
                            Lung contusion.
                            Post traumatic pneumonia.

HISTORY OF THE PRESENT ILLNESS: The patient is a 33-year-old
male with a gunshot wound to the clavicle lateral to the right of
the spine and severe left arm laceration with left sided
pneumothorax.  He was intubated in the Emergency Room.

PHYSICAL EXAMINATION: Upon arrival, the patient was intoxicated
and somewhat confused.  Vital signs on admission - blood pressure
54/palpable, pulse 130, respiratory rate 30.

LABORATORY DATA: WBC 8.4, hemoglobin 9.6, hematocrit 28.5.
Blood alcohol level was 213 mg/dl.  Tox screen positive for
amphetamines.

Radiographic studies done this hospital stay are numerous -
7/28/93 left forearm films show comminuted fracture middle third
of the shaft of the left radius.  KUB shows ileus.  Multiple
chest x-rays performed including one with evidence of gunshot
injury to the left hemithorax and retropleural hematoma.
Pulmonary angiogram 8/6/93 shows no pulmonary embolism.  CT chest
on admission shows left hemo- pneumothorax, left lung contusion,
multiple spinal fractures, partial atelectasis.

Consultants this hospital stay include Dr. Hurley and
rehabilitation.

Operative procedures this hospital stay - the patient was brought
to the operating room on 7/29/93 where he underwent irrigation
and debridement of left comminuted radius fracture performed by
Dr. Redondo.  The patient also underwent left thoracotomy and
evacuation of clot and hemothorax performed by Dr. Gonzalez.

The patient was taken to ICU intubated and ventilated.  The
patient was brought back to the operating room on 8/3/93 for open
CONTINUED

DISCHARGE SUMMARY

GROUND D

COUNSEL FAILED TO DEVELOP A VIABLE DEFENSE
STRATEGY:

1) THE "DEAL" FOR 2ND DEGREE WAS BASED ON WITNESS
B. McINTARF'S TESTIMONY IF NEWELL AGREED TO A BENCH TRIAL,
BECAUSE COUNSEL NICHOLS ALLOWED THE TRIAL TO PROCEED ON
THE 1ST DAY, WITHOUT REALIZING THAT McINTARF WOULDN'T
TESTIFY, HE GAVE NO OPENING STATEMENT AND LOST ANY EFFECTIVE,
CROSS-X OF THE STATE'S WITNESSES, i.e. JUST GOING THROUGH THE
MOTIONS WITHOUT ANY AFFIRMATIVE DEFENSE, PRIOR TO THE 2ND DAY
OF TRIAL HE FOUND THAT HIS WITNESS SUPPORTING SUDDEN & INTENSE ANGER
WOULDN'T TESTIFY AND SUBSTITUTED A FRIEND OF MINE, JOHN PIOROWSKI,
TO COVER FOR HIM, BUT JOHN ONLY ATTESTED TO MY NON-VIOLENT-CHARACTER.
COUNSEL THEN CHANGED TO A SELF DEFENSE  ↳ ARGUMENT     (TR at A-71)

2) FAILED TO INTRODUCE/INVESTIGATE PRESENCE OF ANOTHER
SHOOTER AT THE SCENE (GERRY) SHOWING REASONABLE DOUBT, ALTERNATIVELY,
IF COUNSEL DIDN'T HAVE THE POLICE REPORTS, IT WAS A BRADY VIOLATION.
ANOTHER EYEWITNESS, RICH RODRIGUEZ, CONFIRMED GERRY'S PRESENCE,
BUT WAS NEVER PRODUCED AT TRIAL. GERRY WAS INVESTIGATED BY
POLICE AS A PERSON SEEN LEAVING THE SCENE.
     BY RESTING WITHOUT PRESENTING ANY EVIDENCE THE JUDGE WAS
LEFT TO BELIEVE THE PROSECUTION WITNESSES AS THE ONLY ACCOUNT OF THE
INCIDENT, SEVERELY PREJUDICING NEWELL.

NOTE: HE CHANGED TO SELF DEFENSE WITHOUT PRESENTING
ANY EVIDENCE OR PRACTICAL THEORY

COULDN'T GET AN AFFIDAVIT
FROM R. RODRIGUEZ DUE          (SUPPORTING DOCUMENTS FOLLOW)
TO MY INCARCERATION             NUMBERED - IV - 1-3,8,  II -/3,14 III - 4,7

EVIDENCE NEVER PRESENTED IN COURT

SECTION ~~III~~ IV-1

1) Shows 3 different versions of events. This
evidence was never shown to me or discussed with me. I requested
to see any discovery, police reports, evidence,etc. Counsel
said that Judge Erickson would not allow me to see it. I asked
counsel to verbally motion the court. *COUNSEL NEVER USED THIS INFO.
OR DIDN'T HAVE IT (BRADY)*

2) Version II indicates the presence of a third
person shooting at the scene. This was never brought up or
investigated. Police reports show that another person was
questioned as a shooter at the scene. (E-22)

IN VERSION ~~I & II~~ II

RICK RODRIGUEZ VERSION CONTRADICTS EYE WITNESS
TESTIMONY AND ~~WAS~~ WAS NEVER INVESTIGATED

ALSO: NOTE STREET NOTES DIFFER FROM TYPED OUT
VERSIONS Ie. 2ND FIGHT BY COURT (VOLLY BALL) — ~~FIRST~~
SKINNY GUY (DEFENDANT) SHOOT AT ? & HIT TONY.

ALSO:
1) NOTE: CROSS-EXAMINATION OF DETECTIVE BERNATEK
NOTHING MENTIONED ABOUT DIFFERENT VERSIONS
SEE ( TR AT B-17
          " " B-18
          " " B-19 )

2) I KEPT ASKING FOR DISCOVERY TO SEE WHAT EVIDENCE
COUNSEL COULD INVESTIGATE & PRESENT IN COURT & TO
DETERMINE GUILT / INNOCENCE

(IV-2)

There were several versions of the shooting which were in the police reports , but were not introduced at trial:

POLICE REPORT

I.  [  Victim  #  1-- Deceased  ]       V # 1  was in a fight with V # 2
    [  Victim  #  2--Petitioner ]       V # 1  tried to kick  V # 2
                                        V # 1  pulled a gun and shot V # 2
                            ( or  V # 2     "    "    "    "    "

                                        (E-30)

(THIS WITNESS, NEVER INVESTIGATED)

II.   V # 1:   weight --195 lbs.  , age 28
Petitioner :      "       150  "   ,  "  50

                    Sitting by the vollyball court , noticed
SKINNEY SHOT AT a fight break out with Tony( fat guy ) and skinny guy.
... and Gerry had a gun and fired at skinny guy. At trial another man(Joe M.) was said to shoot defendant.

III.  Detective Bernatek --  ... person # 1 (deceased) shot unknown
HE TESTIFIED  BUT WITHOUT ANY           person # 2 ( critical with GSWs to chest, left
EVIDENCE QUESTIONS ON THIS VERSION      arm and back). Person # 1, was then shot by
     ON CROSS-X     →                   as yet unknown third person.  (E-18)

These versions were never brought out at trial, were not investig-
ated or were supressed by the prosecution. Had these facts been known
at trial , petitioner could have raised proper defenses of possible

                              -- self defense
                              -- reasonable doubt
                              -- diminished capacity
                              -- actual innocence
        had petitioner had access to discovery with counsel.


        These  multiple versions cast doubt on the state's theory
of the shooting.


        The physical/material evidence , which was not presented at
trial makes implausible the eyewitness testimony and if presented
would have cast reasonable doubt of guilt and questioned the conviction
and sentencing based on an unprovoked shooting.


-6-

53-c

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

DATE OF ORIG. CASE REPORT 28 Jul 93
DATE OF THIS REPORT 28 6 93

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT
Homicide

VICTIM'S NAME AS SHOWN ON CASE REPORT
Rodriguez, Anthony

BEAT/UNIT ASSIGNED
5211

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

V #1 was in a fight w/ V #2

V #1 tried to kick V #2

& V. #1 pulled out gun &
shot V #2.

LOT
V #2  CFD 51

JOHN DOE        CHEST T&T
                DLK ARM

GARZES
V #1  CFD 25    R. CHEST
     JOHN ALA DOE
                DEAD

OR. STAB WND
V #2 - CSL. BEL L. CLAV DR. GONZALES

CSL. CENTER BACK        BITH KNEES
  & CSL T+T                TORN UP
    L. ARM TORN & BROKEN    & DIRTY

R.D. NO. X347089

REPORTING OFFICER'S SIGNATURE—STAR NO.
R. Abata 20315

RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO.
#2173

DAY-MO.-YR.  TIME
4 Aug 93  0300

CPD-23.102 (REV. 2/83)

E-18

| CHICAGO POLICE DEPARTMENT | | | RD NO |
|---|---|---|---|
| | | | X 342996 |

| ADDRESS OF SERVICE | VICTIM'S NAME | | SEX-RACE-AGE | AREA-DIST-BE- |
|---|---|---|---|---|
| 13600 S. Calhoun | | IV-8 | 3 | 04 |

| ASSIGNMENT TYPE | REQUESTED BY | DATE RECEIVED - TIME | UNIT |
|---|---|---|---|
| CS | 0432 | 28 Jul 93-0450 | |

## PHOTOGRAPHY

| A O/A gravel area at 13600 S. Calhoun | D O/A boat (IL 17760) C/U damage, left side | G ID Unk #2 C/U wounds - chest |
|---|---|---|
| B O/A weapon on ground C/U | E ID Unk #1. C/U wound, right side chest | H |
| C O/A Ford (lic/ RD 2488) C/U damage, rear side | F O/A tattoo right arm | I |

| FINGERPRINTS | ELIM. PRINTS ☐ YES ☐ NO | IN CUSTODY ☐ YES ☐ NO | NAME (LAST, FIRST) | SEX-RACE - D O B | C.B. NO | FBR NO |
|---|---|---|---|---|---|---|

| MED NEG LIFT | LOCATION FOUND | F N | MED NEG LIFT | LOCATION FOUND |
|---|---|---|---|---|
| W | five shot revolver SR# 19938 (PH) | | | |

Fingerprints photographed by John J. Miller #15765            1 - 4"x5"neg 28 Jul 93

| POSSIBLE SUSPECT INFORMATION ☐ MALE ☐ FEMALE | ☐ ADULT ☐ JUVENILE | RACE | TOTAL NO OF LIFTS | DATE OF TRANSMITTAL |
|---|---|---|---|---|

| ☐ PALMS ☐ IMPRESSIONS ☐ FINGERPRINTS | SUITABLE FOR COMPUTER ☐ YES ☐ NO | PRINTS SUITABLE FOR COMPARISON ☐ YES ☐ NO | INITIALS OF EXAMINER | DATE 29 Jul |
|---|---|---|---|---|

| VEH YEAR | MAKE & MODEL | COLOR | STATE LICENSE NO | VIN |
|---|---|---|---|---|
| | Ford Taurus | black | RD 2488 | 1FACP52340PG144985 |

## PHYSICAL EVIDENCE

| PROP INVENT NO - UNIT | DESCRIPTION & LOCATION | INITIA |
|---|---|---|
| H198251  177 | one Iver Johnson 5 shot revolver, 1 1/2"bbl, chrome, SR# 19938; two 38 S&W discharged cartridge cases and three 38 S&W cartridges taken from the revolver at 13600 S. Calhoun. | PH EA |
| H198252  177 | one AA GSR# 93-142 administered to Unk #1 one AA GSR# 93-143 administered to Unk #2 at Christ Community Hospital ER. | |

## DETAILS OF CASE

At 13600 S. Calhoun R/T met Det. Bernatek who related that during a disturbance unknown pers #1 (deceased) shot unknown person #2 (critical with gsws to left chest, left arm and back). Person #1 was then shot by an as yet unknown third person. R/T photographed views depicting c ditions of the scene and surrounding area, searched for and collected the noted physical ev dence. Vehicles were examined that appeared to have been damaged in the gunfire exchange with negative results. At Christ Hospital, R/T examined and photographed views depicting the ondition and wounds of both parties. AA GSR examinations were administered to both persons t the request of St 5212. Polaroid photos were taken and turned over to St 5212.

| INVESTIGATING OFFICER'S NAME | STAR NO | UNIT | BEAT OFFICER'S NAME | STAR NO | UNIT |
|---|---|---|---|---|---|
| Arbataitis #20315  Bernatek #20016 | | 5212/622 | Busin | 3004 | 0432/004 |

| REPORTING TECHNICIAN - PRINT LAST NAME - FIRST - STAR NO - UNIT | | DATE ARRIVED | TIME | TIME COMPLETED |
|---|---|---|---|---|
| Patrick Moran #7713  Robert Baikie #3623  177 | | 28 July 93 - 0510 | | 1000 |

| TECHNICIAN'S SIGNATURE | DATE | APPROVING SUPERVISOR (PRINT NAME) - STAR NO |
|---|---|---|
| | 28 July 93 | SUPERVISOR'S SIGNATURE |

1 949 (REV 10-92)

1    THE COURT:  Any objection?

2    MR. BERLIN:  No objection.

3    THE COURT:  They will be admitted.

4    MR. NICHOLS:  With that this Defense rests.

5    THE COURT:  Rebuttal?

6    MR. BERLIN:  We have no rebuttal.

7    THE COURT:  Argument?  State, waive opening?

8    MR. BERLIN:  Yes.

9    THE COURT:  Argue?

10   MR. NICHOLS:     Judge, it's clear in this case,

11   Judge, that my client acted both in self-defense and

12   as a result of provocation.

13        Judge, the description of the fight by

14   the witnesses shows that they were trying to minimize

15   what happened.   There this was a brief tussle but the

16   injuries that Officer Bernatek saw when he went to the

17   hospital, the bruises on my client's face, on his

18   hand, on his arms, and on his knees show there was a

19   longer fight than what is indicated by the witness.

20        I would just like to say again that the

21   point of view of those witnesses was quite different

22   than the point of view of my client.   My client had

23   just been beaten, had just had his face rubbed in the

24   gravel, and he was standing three feet away from the

1    man who had just done this to him.

2                    Judge, his act was an act of

3    self-defense and was a result of a sudden and intense

4    passion.  Judge, in this case although a murder

5    finding may be warranted, that finding should only be

6    murder in the second degree.  Thank you, Judge.

7        THE COURT:  Let me ask you before you sit down the

8    sudden and intense passion between the confrontation

9    between the victim, victim and defendant, at the time

10   of first fight.

11       MR. NICHOLS:  Yes.

12       THE COURT:  The testimony is that the kick was --

13   that the victim kicked the defendant and rubbed his

14   face into the cinders.  That's the sudden and intense

15   passion?

16       MR. NICHOLS:    Yes.

17       THE COURT:  Pursuant -- so that it's your argument

18   he came back and shot him?

19       MR. NICHOLS:    I don't think when he came back

20   that was his intention.  I think when he got there,

21   confronted with the man, and saw the man's hands,

22   clawed, he thought he was being attacked again, and he

23   acted in response to that provocation, in response to

24   that action by the decedent.

WHY DIDN'T COUNSEL USE THE POLICE REPORT
THAT SHOWS DECEASED ATTACKING
DEFENDANT! (SEE NEXT PG.)
(SEE NEXT PG.)

B-31

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REP |
|---|---|---|
| | DAY / MONTH / YEAR | DAY / MONTH / YEAR |
| | 28 / JUL / 93 | 28 / JUL / 93 |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGN. |
|---|---|---|
| Homicide | Rodriguez, Anthony | 5-212 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

Rico Rodriguez       m/w/33    DOB

772 34663 - Apr   -lo/ Cos     —

Compu aaaa USA - Downers Gr.

New York Corpus World

Sitting by Court I noticed a
Fight Break out with tony (Fat Guy
And Skinny guy

I saw skinny guy shoot
at camera & hit tony  got on bike
skinny guy was running & shooting
back & Gerald had a gun &
fired skinny 4-5 times & fled

S/t1 - upper right chest.

Live GSW Left Clavicle
+ center of Back

NEVER INVESTIGATED

| REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO. | DAY–MO.–YR.   TIME |
|---|---|---|
| | #2163 | 4 Aug 93  1030 |

CPD-23.122 (Rev. 2/83)

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

(IV-1)

DATE OF ORIG. CASE REPORT 28 Feb 93     DATE OF THIS REP. 28 Feb 93

OFFENSE CLASSIFICATION-LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT

Homicide          Rodriguez Anthony          BEAT/UNIT ASSIG. 5211

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

GERALD   J. FUNDUKIA   9 JUL 48
14868   SHEPARD DR.   DOLTON
333 38 4539   (708) 849 4106

AABLE HEATING - 8518 S. ASHC
SERVICE - 224 7212

IR# 0133749

M/W 44 YRS.
5-11 / 178

was at home after 1 AM. get
call that outlaws were on
their way to the River Boa-
But he does not know of they
get their. He will try to find
out who they were. He states that
he was home at the time of the
shooting w/ girl friend
SUE CARLSON F/W

REPORTING OFFICER'S SIGNATURE-STAR NO. 20315     RECEIVED BY SUPERVISOR'S SIGNATURE-STAR NO. #2162   DAY-MO.-YR. 4 AUG 93   TIME 0300

CPD-23.120-(Rev. 2/83)

(4)

GROUND E —

COUNSEL FAILED TO PRESERVE NEWELL'S CONSTITUTIONAL RIGHT TO CONFRONTATION OF WITNESSES, UNDER THE 6th AMENDMENT, BY STIPULATING TO THE POST-MORTEM REPORT, WITH NOTHING OF RECORD THAT NEWELL HAD KNOWINGLY AGREED WITH OR WAS GIVEN THE RIGHT TO OBJECT. NEWELL STATES, UNDER OATH, THAT HE KNEW NOTHING ABOUT THE POST-MORTEM REPORT OR THE STIPULATION TO BE DONE. COUNSEL DID NOT ADEQUATELY EXPLAIN THE CONSEQUENCES OF ADMITTING TO THE CAUSE OF DEATH AND LOST CRUCIAL BULLET TRAJECTORY EVIDENCE OF FACTUAL INNOCENCE WHERE THE M.O.A. (MARGIN OF ABRASION) SHOWED A TRAJECTORY WHICH WAS IMPLAUSIBLE/IMPOSSIBLE BASED ON THE PROSECUTION EYEWITNESS TESTIMONY. COUNSEL FAILED TO MAKE A DEMONSTRATION VIDEO OF LASER PATHS WHICH WOULD SHOW THAT THE "TOE-TO-TOE", "FACE-TO-FACE", HANDS FORWARD WOULD ALLOW THE M.OA OF $\frac{1}{8}$" ON A $\frac{3}{8}$" WOUND (SEE DIAGRAM ATTACHED)

(SUPPORTING DOCUMENTS FOLLOW)
NUMBERED — III - 1-3, 3A, 4, 5, 12-16 + ISSUES PG

- 47 -

J. NEWELL ~1~ 5-566
CASE NO. 93 CR 1997P

SECTION III-1

1) Three witnesses testified at trial that they saw me shoot the deceased. Two said that I was facing him. One said "toe to toe", face to face, about three feet away. One said an arm's length. The the third said about 3-4' away and that he was backing away with arms out hands turned up. The prosecutor demonstrated showing that he was facing me.

2) Defense counsel said that it was self-defense and the arms out was in preparation for the victim to try and kick me. This was the **ONLY** evidence ever presented in support of this theory.

3) This section shows what was stipulated away by counsel and the prosecution. The trajectory of the bullet was totally supressed.

SEE SCHEMATIC DRAWING, TO SCALE, SHOWING TRAJECTORY TO BE IMPOSSIBLE/IMPLAUSIBLE. PAGE THIS SECTION LAST

# EYE WITNESSES

I    JEFF ADAMS   — (REFERRING TO DEFENDANT & DECEASED)

A.  " JUST STANDING TOE-TO-TOE WITH HIM BASICALLY "   ( TR. at A-11 's LINE 15,

Q   " WERE THEY FACE TO FACE ? "   ( " " " - LINE 16

A.  " YES "   ( " " " - LINE 17 )

DEFENDANT —  A.  " REACHED TO THE BACK OF HIS TROUSERS AND PULLED OUT   ( TR-AT A-11,12 )
              " A SILVER-PLATED REVOLVER WITH A BLACK HANDLE.

MR. BERLIN! — THAT THE WITNESS HAS HIS ARMS OUTWARD AND   ( TR - A-12, LINE 4 )
              PALMS FACING UPWARDS.
              ( WITNESS WAS DEMONSTRATING HOW DECEASED WAS STANDING )

Q.  ... APPROXIMATELY HOW MANY FEET WOULD HE HAVE BEEN
         FROM THE DEFENDANT AT THAT TIME?   ( TR at A-12 )

A.  " OH MAYBE THREE."   ——————   ( TR at A-13 )

A.  .... ACTUALLY HE STARTED TO TROT AND HE THREW
         THE REVOLVER UP IN THE AIR. ——  ( TR AT A-13 )

CROSS EXAMINATION
    WITHOUT POINT — ( TR AT A-17, 18, 19 )

ALSO: 1) AT TRIAL MR. ADAMS TESTIFIED THAT I CALLED THE
          DECEASED " M FER " — TR - AT A-11

       2) ON POLICE REPORTS IT WAS " SONOFABITCH " ( SEE EXHIBIT -26 )

       3) WHEN ASST. ST. ATTORNEY SAID THAT DEFENDANT STATED " ... you're going
          To die " MR. NICHOLS (P/D) CORRECTED HIM ~~as~~ OBJECTING
          STATING " THAT WAS NOT HIS TESTIMONY. HIS TESTIMONY WAS,
          " DO YOU WANT TO DIE, MOTHER-~~FER~~? " ( TR AT B-32 )
                                        WHOSE SIDE WAS ~~the~~
              G. NICHOLS (P/D) ON?

E-26

III-3

**GENERAL PROGRESS REPORT**
**· DETECTIVE DIVISION/CHICAGO POLICE**

DATE OF ORIG. CASE REPORT    DATE OF THIS REP.
DAY    MONTH    YEAR    DAY    MONTH    YEAR

28   Ju   93   4 Ju   93

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT   VICTIM'S NAME AS SHOWN ON CASE REPORT        BEAT UNIT ASS'D

Homicide                              Rodriguez  Anthony              521

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.    @ Home

(2.)    Adams, Jeffrey  m/w/34 (21 Aug 59)  Single

17915 S. Wentworth   Lansing Illinois

Tel # (708) 474-0375  -  Wk # (219) 322-3533

Employed @ Star-line Pizza (Lake Edge

(Intel)  Shelbyville, In.

SS # 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

| | |
|---|---|
| - @ Lounge | I BELIEVE THIS WAS |
| - playing volleyball | ADDED TO COVER-UP |
| - outside Volleyball court | WRONG GUN |
| - heard O say to Tony | HOW COULD HE SEE THAT |
| - " Do You want to Die Tonight?" | GUN HAD A BLACK HANDLE |
| - V walk towards O | MY HAND (LEE.) VS. VERY |
| - Hands outstretched (to show he had nothing | SMALL GRIP. |

in his hands)

- O  Repeats  4-5 Times

" You're Going to Die - You

SonofaBitch "

- O  Reached Behind his Back

Jeffrey- Saw N/P Revolver w/ Black Handle

in O's Right Hand

O  Brought Gun Up to the (V) Chest

V  Began to Back Away

REPORTING OFFICER'S SIGNATURE—STAR NO.    RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO.    DAY—MO.—YR.    TIME

McInerney / Bromfield                              #2163   4 Aug 93   0333

CPD-23.122 (Rev. 2/83)

(NEXT PG. SAYS  "THEN SHOT HIM POINT BLANK ")

III - 3(a)

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY   MONTH   YEAR | DAY   MONTH   YEAR |
| | 28  Jun  93 | 29 Jul 93 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| Homicide | Rodriguez Anthony | 521 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations including inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.   — Jeffery Adams

- ① FIRED 1 SHOT
- AT V "POINT-BLANK" in CHEST
- Ⓥ FALLS

  EVERYONE SCREAMING

① TURNS WALKS AWAY FOR

ABOUT 7 STEPS

AS HE GOT TO THE END OF

THE SNOW FENCE

HE BEGAN TO TROT AWAY TOWARD

THE GRAVEL ROAD.

Ⓦ NOW DUCKED DOWN

① OUT OF SIGHT.

Ⓦ HEARD 5 MORE SHOT

SAW Ⓥ ON GROUND - SHOT

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY-MO.-YR. | TIME |
|---|---|---|---|
| Brownfield | #2163 | 4 AUG 93 | 1330 |

CPD-23.122 (Rev. 2/83)

THIS IS
THE JUDGE'S
ASSISSMENT

1    distorted -- that perspective is distorted, nor do I

2    know why the defense would claim that turns this into

3    self defense or provocation.  After the fight, two men

4    arguing, 30 feet away, "Do you want to die, mother

5    fucker or mother," words from the defendant's mouth,

6    which would indicate the defendant's mental state;

7    that he reached into the back of his trousers, pulled

8    out a gun.

9           That according to the testimony of Mr.

10   Jeffrey Adams the victim put up his hands, palms up,

11   demonstrating in the courtroom he put his hands up

12   palms up showing he had nothing in his hands, went two

13   steps backward.  The victim retreated.

14           That the defendant then shot him in the

15   chest at point blank range, turned and went away,

16   threw the gun in the area of Brandy Morrisson who

17   could have some bias in this case because of her

18   friendliness with the -- so to speak with the victim

19   in the case.  Given that bias, her testimony simply

20   doesn't embellish anything but corroborates Mr. Adams

21   that the defendant -- she talked about the Defendant

22   Tony grabbed the defendant and rubbed his face in the

23   gravel and he drop kicked him and a fight had happened

24   prior to the shooting.

EYE WITNESSES                    (III-5)

## II.   STAN WELICZKO

| THIS TESTIMONY IS DIFFERENT THAN HIS STATEMENT WHERE; "HE FIRST HEARD A SHOT & LOOKED UP". SEE STATEMENT NEXT PG.

Q. WHEN WAS THE NEXT TIME THAT YOU THEN SAW THE DEFENDANT, JAN NEWELL?                    (TR at A-42)

A. WHEN HE CAME UP --- CAME WALKING THROUGH THE SNOW FENCE AND WALKED UP TO TONY AND PULLED A GUN OUT AND SHOT HIM.                    (TR AT A-42)

Q. ..., HOW LONG AFTER THE INITIAL FIGHT ....

A. I WOULD SAY HALF HOUR TO 45 MINUTES ——— ( " " " )

NOTE: THE JUDGE SAID STAN W. WAS THE MOST CREDIBLE. SEE TR AT B35,36

Q. DID YOU SEE WHAT TONY WAS DOING WHEN THE DEFENDANT PULLED OUT A GUN AND SHOT HIM.  ——— (TR AT A-43)

A. MR. BERLIN. .... THE WITNESS HAS HIS ARMS EXTENDED OUTWARD WITH HIS HANDS UP.  ——— (TR AT A-44)

Q. ... HOW MANY FEET FROM TONY ..., ——— ( " " " )

A. I'D SAY THREE, FOUR FEET.  ——— ( " " " )

### CROSS-EXAMINATION - MR. GEORGE NICHOLS

Q. BUT YOU NOTICED WHERE IT WAS?

A. - I WENT OVER THERE, YES, AND I LOOKED WHERE THE GUN WAS AT.

Q. - AND THE GUN WAS ABOUT 40' AWAY FROM TR AT A-51 WHERE THE BODY OF JAN NEWELL WAS, IS THAT RIGHT?

A. - YES.

## III. GEORGE MILLER

Q. AND HOW FAR WAS TONY FROM THE DEFENDANT WHEN WHEN DEFENDANT SHOT HIM.  ——— (TR AT A-57)

A. NOT MUCH MORE THAN A ARMS LENGTH ——— ( " " " )

Q. WAS HE FACING THE DEFENDANT AT THAT POINT ——— ( " " " )

A. YEAH.  ——— ( " " " )

### CROSS-EXAMINATION

ONLY ABOUT TIME ELEMENT





1    Anthony Rodriguez.

2                    He would testify that he performed both

3    an external and an internal examination.  His external

4    examination would reveal that Anthony Rodriguez was --

5    appeared to be the stated aged of 28 years old.  His

6    height was five feet nine inches and he weighed a

7    hundred ninety-five pounds.

8                    His examination also revealed a gun shot

9    wound on the right chest 20 inches from the top of the

10   head and four inches to the right of midline.  The

11   course of the wound was from front to back and from

12   right to left, and the doctor would testify that he

13   recovered a medium caliber lead bullet from beneath

14   the skin of the left back.

15                   Doctor Lifschultz would testify that in

16   his opinion based upon a reasonable degree of

17   scientific and medical certainty is that Anthony

18   Rodriguez died as a result of a gun shot wound to the

19   chest.

20                   As part of the stipulation, Judge, the

21   parties would also stipulate that if Nancy Chen,

22   C-h-e-n, were called to testify she would testify that

23   she is employed by Office of the Medical Examiner as a

24   toxicology, and she performed certain tests on fluid





OFFICE OF THE MEDICAL EXAMINER
COUNTY OF COOK, ILLINOIS

REPORT OF POSTMORTEM EXAMINATION

NAME  Anthony Rodriguez          CASE NO.          581 of July, 1993

AGE  28    RACE  White  SEX  Male       DATE OF DEATH          July 28, 1993

ADDRESS OF DECEDENT  13943 Manistee     DATE EXAMINED          July 29, 1993

CITY & STATE  Burnham, Illinois         EXAMINED BY  Barry Lifschultz, M.D.


EXTERNAL EXAMINATION:

The body is that of a White male appearing the stated age of 28
years. The height is 5 feet 9 inches. The weight 195 pounds.
Rigor is present to a moderate degree in all joints. Livor is
present on the posterior dependent portions of the body.

The body is received unclothed. The body is accompanied by a cut
away black shirt, blue shorts and white gym shoes.

The hair is brown, straight and medium length. The eyes are
closed. The irides brown and the conjunctiva are not congested.
A black mustache is present. The teeth are natural and in good
repair. The chest is symmetrical. The abdomen is mildly
scaphoid. The genitals are those of a normal uncircumcised male.
The fingernails are trimmed and clean. The bottoms of the feet
are clean. The toenails are trimmed and clean. On the left chest
there is a sutured incision 15 inches. On the lateral aspect of
the upper portion of the right arm there is a pictorial tattoo.
On the right wrist there is a hospital bracelet. The palms of the
hands are inked. The back is without special note.

EVIDENCE OF INJURY:

1.    On the right chest 20 inches from the top of the head
      and 4 inches to the right of the midline, there is a
      gunshot wound of entrance measuring 3/8 inch x 3/8 inch
      with a margin of abrasion measuring 1/8 inch from 7
      o'clock to 11 o'clock. The course of the wound
      perforates the skin, the subcutaneous tissues, the
      anterior thoracic wall, the right lung, the left lung,
      the major blood vessels of the right and left lung, and
      finally, 14 inches from the top of the head and 4 inches
      to the left of the midline, a medium caliber lead bullet
      is recovered from beneath the skin of the left back.
      The course of the wound is from front to back and right
      to left.

F-131



III-15

Anthony Rodriguez                                                    Page 3
#581 July 1993

INTERNAL EXAMINATION:  (Continued)

MUSCULOSKELETAL SYSTEM:  There are no fractures of the ribs or
long bones.  The muscles show no evidence of disease.

CENTRAL NERVOUS SYSTEM:  The scalp is reflected.  There is no
subgaleal hemorrhage.  The cranial cavity is entered.  There is no
subdural, epidural or subarachnoid hemorrhage.  The gyri of the
brain are unremarkable.  The brain is serially sectioned.  No
pathologic changes are noted in the cerebrum, cerebellum, pons,
midbrain or medulla.  There are no skull fractures.  The spinal
cord and vertebral column are intact.  The weight of the brain is
1310 grams.

ANATOMIC DIAGNOSIS:

1.    Gunshot wound of chest.

2.    Bilateral hemothorax.

3.    Evidence of therapy.

OPINION:

This 28 year old White male, ANTHONY RODRIGUEZ, died as a result
of a gunshot wound of the chest.

                                    Barry Lifschultz, M.D.
                                    Deputy Medical Examiner

BL:klb
9/30/93



1 ALLEY THAT IT CASE BE USED (IMPLAUSIBLE) TO HOLD
THE RIGHT HAND AND TURN OR TWIST THE HAND/WRIST FROM
A DISTANCE OF 3-4', KEEPING THE BARREL OPENING AT LEAST
2' FROM THE WOUND ENTRY (STIPLING LIMIT) AND ACHIEVE
THE M.O.A. AND TRAJECTORY PATH INDICATED BY THE
POST-MORTEM REPORT.

THE PATH IN THE P/M
REPORT WAS IN A STRAIGHT
LINE IE- SKIN RT. LUNG, LT. LUNG
ETC, THRU ALL SOFT TISSUE

SCALE - $\frac{1}{16}$ = 1 IN.

III-16



8"

DECEASED

11" (ESTIMATE)

.06    .06

2'

MINIMUM DISTANCE
FOR STIPLING
IE. GUN BARREL MUST
BE WITHIN 2' FOR STIPLING
OR POWDER BURNS.
(NONE WERE INDICATED)
(ON POST-MORTEM)

ME

3'

3.5'

4'

90°    88°

TRIAL TRANSCRIPTS & EYEWITNESSES SAY
TOE TO TOE, FACE TO FACE,
3-4' APART

THE ANGLE OF ENTRY AND
FINAL BULLET LOCATION MATCHES THE
ANGLE INDICATED BY THE M.O.A.

POST-MORTEM

THE M.O.A. MATCHS THE TRAJECTORY & THE FINAL
LOCATION OF THE BULLET- IE. BULLET ENTRY 4" TO RIGHT OF MIDLINE TO
4" TO LEFT OF MIDLINE A MEDIUM CALIBER BULLET IS RECOVERED FROM
BENEATH THE SKIN OF THE LEFT BACK, BULLET ENTERED 30" FROM TOP OF
THE HEAD & WAS FOUND 14" FROM TOP OF THE HEAD, WITH A M.O.A. OF $\frac{1}{8}$"-7-11 O'CLOCK,
BULLET HOLE $\frac{3}{8}$" X $\frac{3}{8}$"

12 O'CLOCK

9    11"    3

6

(M.O.A)    MARGIN OF ABRASION
$\frac{1}{8}$" - 7 TO 11 O'CLOCK - BULLET HOLE $\frac{3}{8}$" X $\frac{3}{8}$"

### THESE ~~ISSUES~~ AND THIS EVIDENCE WAS/WERE NEVER INVESTIGATED OR PRESENTED IN COURT:B

1) Witnesses testified that they heard **one** shot from defendants gun. The weapon the prosecution alleged to be the murder weapon had been fired twice , ie., two expended cartridges were found in the gun.  **What happened to the second bullet?**

2)  The fatal bullet was not able to be related to any specific weapon. The post-mortem report stated that the bullet passed through soft tissue. It did not strike any bones and moved in a straight line.

**How did the bullet become so damaged that it could not be identified with the alleged murder weapon?**

      a)  **Possibility # 1 -- it came from another weapon**

                        **# 2 -- the bullet hit something and was deflected into the deceased**

Defendant's left arm has evidence ( scar) of a bullet wound. Defendant's  severe arm wound was assessed as a gunshot wound. The police report and emergency room listed it as through and through. **After striking and fracturing defendant's arm the bullet could have struck the deceased.**

( THE BULLET WOULD HAVE MY DNA ON IT. )

**NONE OF THIS WAS INVESTIGATED**

There is so much **uninvestigated tangible evidence available** which would have altered the outcome that its apparent that there was total lack of adversarial testing in my case.

All that is required is that the facts get before an impartial court.

BULLET PATH — FROM POST MORTEM REPORT

GROUND F - COUNSEL - A FAILED TO INTRODUCE THE FIREARMS EVIDENCE REPORT SHOWING THAT THE FATAL BULLET WAS FIRED FROM A SMITH & WESSON GUN AND NOT NEWELL'S GUN WHICH WAS AN IVER-JOHNSON, ALTERNATIVELY, THAT IF COUNSEL DID NOT HAVE THIS REPORT IT WOULD BE A BRADY VIOLATION AND WOULD CAUSE SEVERE PREJUDICE TO NEWELL AND PREVENT ADVERSARIAL TESTING OF THE CASE. THAT THIS EVIDENCE WAS INCLUDED IN NEWELL'S POST-CONVICTION AND THE 2-1401 (RELIEF FROM FINAL JUDGEMENT) AS EXHIBITS. FAILED TO SHOW 2ND GUN, ESR RESULTS, FITNESS EVALUATION.

GROUND G - COUNSEL - A FAILED TO PROTECT NEWELL'S RIGHT TO COUNSEL IN NOT PREPARING HIM FOR THE FITNESS EVALUATION WHERE THE STATE KNEW THAT NEWELL WAS NAIVE TO THE CRIMINAL SYSTEM BUT SOLICITED EVIDENCE OF WHETHER NEWELL HAD A GUN, WHERE WAS IT, WHAT KIND, ETC. WITHOUT COUNSEL BEING PRESENT. THE STATE KNEW THAT A S&W .38 CAL GUN HAD BEEN RECOVERED AT THE CRIME SCENE AND NOT THE IVER-JOHNSON, BUT PICTURED THE IVER-JOHNSON IN COURT WHEN THEY KNEW IT COULDN'T BE THE MURDER WEAPON. THIS WAS EVIDENTIARY MANIPULATION BY THE STATE

(SUPPORTING DOCUMENTS FOLLOW)
NUMBERED -
X - 1 - 15 WITH XTRA PG. BETWEEN 9 & 10

J. NEWELL - K 50566
CASE No. 93 CR 19978



SECTION ~~II~~

1)  Shows two different weapons placed in inventory and two kinds of bullets fired. One weapon was suppressed and never brought into court.

2)  Neither weapon could be identified as the fatal weapon.

3)  There were no fingerprints lifted from the alledged murder weapon.    ( **Exhibit** ~~■~~ )

4)  The gunshot residue tests were administered to both me and deceased ( why? ). Both were inconclusive.

5)  At trial ~~all~~ witnesses testified that after I shot the deceased I turned and as I was leaving thru the gun on the ground. ( What happened to the prints?) and ( What happened to the gunshot residue?).

NOTE: THE "GUN" WAS 35' WEST OF (SEE DIAGRAM ~~■■.■■~~).

BUT THE ~~TECH~~ TECHNICIANS SAID IT WAS A
(S&W) SMITH & WESSON, WITH NO NUMBER, ~~■■■~~ STAINLESS STEEL (RECOVERED)

LATER: THE ALLEGED MURDER WEAPON WAS CHANGED TO A IVER-JOHNSON, WITH A SERIAL NO. (~~■■■■■~~) THAT GUN WAS PICTURED IN COURT AS STATE'S EXHIBIT #3 (TR AT A-17)

THIS WAS AFTER THE FITNESS EVALUATION AND I TOLD THEM MY GUN WAS AN IVER-JOHNSON W/ A SERIAL #

[ BUT THE SCHEMATIC OF THE CRIME SCENE ONLY INDICATES
ONE GUN FOUND ]



ORIGINAL OFFENSE
CASE REPORT
CHICAGO POLICE

OFFENSE CLASSIFICATION — Homicide

PRIMARY CLASSIFICATION — Homicide

SECONDARY CLASSIFICATION — First Degree Murder

STREET ADDRESS OF OCCURRENCE — Patio + Parking Lot, Riverside Lounge

POLICE PERSONNEL

NARRATIVE / NO ADDITIONAL INFORMATION

PROPERTY

CIRCUMSTANCES

OFFENDER

WITNESS

ADDITIONAL VICTIMS

SCENE

Case 1:08-cv-03711 Document 1 Filed 06/30/2008 Page 69 of 94

A .38 Cal. Stainless Steel 2" Barrel S&W with no _____ to Chest L/Bro by Ladeback #45. Off. #1 Rsponded to
Retail Number found at this scene -depron ars _____ Chest. Hosp by Tac Amb 51. Sgt. Hady Beat 130 c.____
Recovered Approx. 35 ft west of Officer #1. Witness _____ Curr. Unit 6:22 off Resater Ct. Book a UNIT #11 off. Maria
Miller George related the following Victim #1 Arts _____ This 30:35. Also on scene. Crime Lab Unit of Invest. At.
three Roll y Ball in Roto Ada Cubor Officer #1 _____ Appointed Scene is MANN 7718 clarkie #L33 degree involved Sgt.
a Mann A Retaliae a shot Victim #1 in the chest _____ Unit #740. But #1 Miller George of #7427 Ahrned Hard Shot
Sgt. Gun Ferent, offender #2 buland out as Jerry _____ Hosp 1-708-591-7464, Unit #3 Laskic 2:16 Star J
Casel Off. #2 and Shot At Him Again three three Than _____ of 47 VK Swatchmore Anwo Zoo 1-219-932-2629. Victim
three to the back after electin Office #2 _____ Removed by Dr. Allis At 07:21.
Rad the glass out Motorcycle Victim #1 removed

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

IV-4

DATE OF ORIG. CASE REPORT   28 Jul 93
DATE OF THIS R.   28 Jul 9-

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT   VICTIM'S NAME AS SHOWN ON CASE REPORT
Homicide   Rodriguez Vashon

BEAT/UNIT ASS.   5 2 1

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvass notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

RD 2488
HGRP

1 FACP 5740 PG 1448
P-432599
K/R WHeel

Bullet

BOAT   IL 2774 GC   Dept of
94   Buster HI-MAN   Conv
4 + YouR BKut   Buuet Hole

9602 = P MORAN 7718
R BRIKIC 3623

3 Round No Door
5 Shot   2 - E + feul)
Sgt W   No Number

X 342 986

G OFFICER'S SIGNATURE—STAR NO   2081
RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO   A2163
DAY-MO.-YR.   TIME   1 Aug 93  0300

(Rev. 2/83)

-41-

# FORENSIC INSTITUTE
## MEDICAL EXAMINER CASE REPORT COOK COUNTY

**CASE NO:** 581 JUL '93

| DECEASED: Antoni Rodriguez | AGE 18 | SEX M | RACE W(H) | ADDRESS (Unknown) 13943 Manistee  ZIP: APT: ( ) |
|---|---|---|---|---|
| DOB: 4/10/65 | SSN: | | | TYPE OF INVESTIGATION  Burnham, IL  PHONE |

**CLASSIFICATION:** Gunshot wounds to the chest

PHOTOS TAKEN: No  SCENE___ TELEPHONE XXXX F.H.___ HOSP___

**ADDRESS OF OCCURRENCE:** ±3600 So. Calhoun Ave.   Chicago, Il.

**TYPE OF PREMISES WHERE FOUND:** Parking lot

**TIME/DATE FOUND:** 0425 hrs.   28 July 93

**POLICE AGENCY R.D. #** X 342-985

| PERSON DISCOVERING DECEASED | RELATIONSHIP | ADDRESS | PHONE |
|---|---|---|---|
| Citizen | N/A | N/A | N/A |
| **PERSON INTERVIEWED** Det. Bernatek | Assigned Detective | Area 2 V.C.Unit | 747-6272 |
| | | | |

**PRONOUNCEMENT:** DATE: 28 July 93 TIME: 0521 hrs.   **PHYSICIAN:** Dr. Allen   **HOSPITAL:** Christ

| POLICE NOTIFIED | INSTITUTE NOTIFIED | ARRIVAL | CLOSED |
|---|---|---|---|
| DATE: 28 July 93 TIME: 0425 hrs. | DATE: 28 July 93 TIME: 0635 hrs. | DATE: 28 July 93 TIME: 0720 hrs. | 28 July 93 0750 hrs. |

Telephone investigation:
Gunshot wounds to the chest.

**NARRATIVE: DESCRIBE CIRCUMSTANCES SURROUNDING DEATH-PHYSICAL EVIDENCE, ETC.**

According to Det. Bernatek, Chicago P. D., on 28 July 93, at about 0425 hrs., the subject was the apparent victim of gunshot wounds to the chest after he had been shot during an argument with another unknown white male. The incident took place in a parking lot at 13600 So. Calhoun Ave.. Subject was transported from the scene by Chicago F.D. ambulance #25 to Christ hospital where he expired in the emergency room and was pronounced by Dr. Allen at 0521 hrs. The remains were ordered to the Institute.

Det. Bernatek said that Chicago P.D. crime lab technicians recovered a Smith & Wesson five shot revolver, blue steel with a two inch barrel at the scene. The cylinder contained two expended cartridge cases and three live cartridges. The weapon was placed in police inventory.

The offender, an unknown white male is also in Christ hospital with gunshot wounds, he also had been struck by a motorcycle. He is listed as being in critical condition. Charges are pending further police investigation.

REPORTING INVESTIGATOR   -42-   SUPERVISING SIGNATURE

SEAL NO'S: N O

SUMMER - 1995    FITNESS EVALUATION    

PSYCHOLOGIST SAID "YOU CERTAINLY HAD ENOUGH PROVOCATION" (HOW DID HE KNOW?)

PSYCHIATRIST "WITHOUT COUNSEL" PRESENT

DO YOU OWN A GUN? WHAT KIND, COLOR, CALIBER, HOW MANY SHOTS DID IT HOLD, MAKE, SERIAL #, WAS HANDLE BLACK OR BROWN?, WAS IT AN IVER-JOHNSON I TOLD HER THAT I DID HAVE ONE THAT I KEPT IN MY CAR AND IT MIGHT BE AN IVER-JOHNSON, 5-SHOT, CHROME, ETC.

QUEST. WHY WOULD THAT INFORMATION BE SOLICITED DURING A FITNESS EVALUATION? (WITHOUT COUNSEL) - I HAD NEVER BEEN INVOLVED IN THE CRIMINAL SYSTEM AND ANSWERED HONESTLY

ALSO: I NEVER HAD FIRED THAT GUN & DIDN'T EVEN KNOW IF IT WORKED. I STATED THIS AT SENTENCING, BUT IT WAS LEFT OFF OF THE TRANSCRIPTS. I WILL TAKE A POLYGRAPH TO THAT.

— THEY WANTED ME TO THINK MY GUN WAS THE MURDER WEAPON WHEN ANOTHER GUN (S&W, 5-SHOT .38 CAL. 2" BARREL WITH NO SERIAL #) WAS THE RECOVERED WEAPON, BY CRIME SCENE TECHNICIANS (SEE THEIR REPORT)

THE TECHNICIANS ONLY RECOVERED - 1 - GUN (THE S&W) AT THE CRIME SCENE. ALSO:
THE FATAL BULLET COULD NOT BE RELATED TO A SPECIFIC WEAPON ALTHOUGH IT WAS LABELED .38 S W ???
(SEE EXHIBIT 16)
SECT. IV PG.9
THIS SECT.

EVIDENCE & RECOVERED PROPERTY - SECTION USE ONLY

## DESCRIPTION OF PROPERTY

| LINE NO. | QUANTITY | | U.S.C. ONLY |
|---|---|---|---|
| 1 | | Chicago Police Dept. Johnson - 5 shot - 18 + Barrel S & W 1993B | |
| 2 | | Gun Cartridges | |
| 3 | 2 | Fired Cartridge Cases | |

**NOTE:** Clerk Writes - OH Received # 17224 Gun Desk

**NOTE:** Say they found a different gun — Same crime scene Technician's Notes

| | |
|---|---|
| □ CHECK ALL BOXES APPLICABLE | |
| □ U.S. CURRENCY TO BE DEPOSITED | □ U.S. CURRENCY TO BE HELD IN ORIGINAL FORM -DO NOT DEPOSIT. |
| □ MISDEMEANOR □ FELONY STATE CHARGES | □ C.P.D. CONTINGENCY FUND MONEY |
| □ RECLASSIFIED FROM: NAME □ ARRESTED | □ JUVENILE |
| | □ GAMBLING RAID SEIZURE |
| □ HOMICIDE □ MANSLAUGHTER | □ MEDICAL EXAMINER'S PROPERTY |
| □ ARSON | □ NARCOTICS & RELATED |

IND. BY: NAME □ CHECK IF C.P.D.

□ HOLD FOR INVESTIGATION AND/OR EVIDENCE

INVESTIGATING OFFICER: STAR NO. ___ DET. ___ UNIT ___

TO BE DISPOSED OF BY CUSTODIAN (NOT TO BE RETURNED)

OWNER'S NAME: Ground - Parkway Ave. N.

ADDRESS: 13000 S. Calhoun

OFFICER'S NAME: N. Baltatis STAR NO. 20315 UNIT 632

2nd OFFICER'S NAME: STAR NO. 3423 UNIT 177

SIGNATURE / DATE / TIME

NOTICE TO PROPERTY OWNER OR CLAIMANT

□ PROPERTY RELEASE ORDER (CPD-34.554) REQUIRED

RETURN TO THE POLICE STATION WHERE YOUR PROPERTY WAS TAKEN FROM YOU. GIVE THIS COPY TO THE DESK OFFICER IN CHARGE FOR FORMS AND INSTRUCTION NECESSARY FOR THE RETURN OF YOUR PROPERTY.

UPON OFFICIAL NOTIFICATION THAT INVENTORIED PROPERTY IS AVAILABLE FOR RELEASE, THE SUBJECT OWNER OR CLAIMANT MUST PICK UP THE PROPERTY WITHIN 30 DAYS OF NOTIFICATION OR THE PROPERTY WILL BE LEGALLY DISPOSED OF ACCORDING TO THE DIRECTION OF THE LAW.

NOTICE TO FINDER (GIVE OR MAIL THIS COPY TO FINDER)

OBTAIN UNCLAIMED PROPERTY AFTER 30 DAYS AND BEFORE 45 DAYS FROM THE DATE OF INVENTORY.

YOU MUST OBTAIN A PROPERTY RELEASE ORDER FROM THE RECOVERING UNIT PRESENT THE PROPERTY RELEASE ORDER TO THE EVIDENCE & RECOVERED PROPERTY SECTION.

2650 SOUTH CALIFORNIA, ROOM B804 8:00 A.M. TO 4:00 P.M. MONDAY THROUGH FRIDAY (CLOSED HOLIDAYS)

CALL 747-6224 OR 747-6225 TO ARRANGE TO PICK UP BULKY ITEMS.

ARRESTEE INFORMATION

SEIZURE WITHOUT SEARCH WARRANT - (III. Rev. Stat. Chap. 38, Sec. 108-2). 725 ILCS 5/108-2). GIVE THIS COPY TO ARRESTEE. IF NOT ACCEPTED, ATTACH TO COPY 5.

SEIZURE WITH SEARCH WARRANT - (III. Rev. Stat. Chap. 38, Sec. 108-10). 725 ILCS 5/108-10) ATTACH THIS COPY TO SEARCH WARRANT.

| | |
|---|---|
| □ AL DESTINATION OF PROPERTY & RPS | |
| □ POLICE MAIL □ CRIME LABORATORY | □ MEDICAL EXAMINER □ AUTO POUND NO. |
| □ E & RPS PICKUP | □ RECOVERING UNIT PERSONNEL □ EVID. LAB TECHNICIAN |

APPROVING DESK SERGEANT

AUTO POUND NO:

COPY 4 - GIVE OR SEND TO FINDER, ARRESTEE OR OWNER

-44-

DETECTIVE DIVISION
AREA TWO VIOLENT CRIMES
HOMICIDE/1ST DEGREE MURDER
VICTIM:   RODRIGUEZ, ANTHONY

Page #2

29 July
RD#X-342



(IV-8)

INJURIES:

RODRIGUEZ-single GSW right upper
chest,above and approx.1inch left of
nipple (fatal)

NEWELL-GSW left fore arm,T&T
        GSW enter center back exit below
            left clavical
        bruises to face,hands,arms and
            both knees.

TAKEN TO:

both victims transported to Christ
Hospital.
Rodriguez by CFD #25
Newell by CFD #51

WEAPON:   *PICTURED IN COURT*
*THIS IS A DIFFERENT GUN*
*FROM THE ONE RECOVERED BY*
*CRIME SCENE TECHNICIANS.*

Iver Johnson,.38 cal.,chrome,1 1/2 inch
bbl.,5 shot revolver,Sr#19938 (recovered

LOCATION:

13600 S.Calhoun Riverside Lounge
outside patio and parking lot

?

F/DATE/TIME:

Wednesday,28 JULY 93,0415 hrs.

WEATHER/LIGHTING:

clear,75 deg./good artificial lighting

MANNER/MOTIVE:

shot victim / after fight over females

NOTIFIED BY:

RODRIGUEZ was identified from polaroid by
Robert Rodriguez (father) and Theresa
(sister) Formal identification to be made
at M.E.

EVIDENCE:

INV#1198251-Iver Johnson,.38
cal.,chrome,1 1/2 inch
bbl.,5shot,revolver ser#19938.
two .38 S&W discharged cartridge cases
    three .38 S&W live cartridges taken
    from above weapon

INV#1198252-one AA GSR #93-142 -Newell
            one AA GSR #93-143 -Rodriguez

(-45-)

photos as discribed in Crime lab evidence
report.

CASE NO.
:

M.E. Turner assigned case 581 JULY 93
Victim pronounced by DR.Allen 0521Hrs.
Christ Hospital

# CRIME LABORATORY REPORT
## CRIME LABORATORY DIVISION/CHICAGO POLICE

| INCIDENT/OFFENSE CLASSIFICATION | | | |
|---|---|---|---|
| HOMICIDE / MURDER — | *(IV-9)* | I-UCR OFF. CODE 0110 | RD NO X342989 |
| VICTIM'S NAME | | DISTRICT   AREA | DATE OF THIS REPORT |
| RODRIGUEZ, ANTHONY | | 004 | 06-08-93 |
| DEFENDANT'S NAME | | LABORATORY UNIT | |
| | | FIREARMS | |

### SUMMARY FINDINGS  -  FIREARMS EVIDENCE

The following fired evidence was submitted to the Crime Laboratory for examination, classification and evaluation relative to RD X342989:

| INVENTORY NUMBER | DATE RECEIVED | CLASS CHARACTERISTICS | SUITABLE FOR COMPARISON | PLACED IN OPEN CASES |
|---|---|---|---|---|
| 1202467 | 29-07-93 | 38SPL 5R | Possibly | No |
| **FATAL BULLET →** 1194015 | 30-07-93 | 38SW ?? | No | No |

None of the submitted fired evidence has been identified with a specific weapon. All evidence that has not been placed in the open case file has been forwarded to the Evidence and Recovered Property Unit.

*QUESTIONS!* How CAN A FIRED BULLET BE LABELED "38SW" ??
Does THAT MEAN THAT IT WAS FIRED FROM A "S&W GUN"

IF SO THEN MY GUN DIDN'T FIRE THE FATAL BULLET
AND I AM INNOCENT

CENTRAL QUESTION: DOES CLASS CHARACTERISTICS REFER TO A *TYPE* OF GUN OR BULLET?

(-46-)

| COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) |
|---|---|
| 2 TO A2 VC | Robert J. Smith |
| | SIGNATURE |

RD NO X342989

9/89

.....With Regard to identification of the bullet in
question, the expert testified that the basis for
firearms identification is the similarity in the
in the RepRoduction of the class 'and individual'
characteristics. He identified various <u>class chaRacteR-</u>
<u>istics</u> common to the bullets involved herein, and he
explained that **class characteristics** are characteristics
common to **certain <u>types of weapons</u>**.....

**People v. Richardson**, 123  ll.Dec. 908,
914, 528 N.E. 2d 612 ( ll.1988)


 In the CRIME LABORATORY REPORT --titled Summary Findings-
Firearms Evidence  under <u>Class Characteristics</u>

Fatal Bullet  ..............38SW??

    Shows  excuLpatory evidence of actual/factual innocence as
the fatal bullet was fired from a Smith&Wesson revolver and not
the Iver-Johnson, which was identified as the murder weapon.
and pictured in court as Exhibit #3 for the State. This caused
severe prejudice to defendant.

  The  Iver-Johnson was the gun which was identified by the
defendant, during his fitness evaluation, as his. This was without
counsel being present.

      Question?-- Was it a BRady violation for the State to
                intRoduce a picture of a gun, as the alleged
                murder weapon, when they knew that it didn't
                fire the fatal bullet, even though they solicited
                that it only " looked like it" ?

IV-10

**CRIME LABORATORY REPORT**
CRIME LABORATORY DIVISION/CHICAGO POLICE

| INCIDENT/OFFENSE CLASSIFICATION | | I-UCR OFF CODE | RD NO |
|---|---|---|---|
| HOMICIDE / MURDER | | 0110 | X342999 |

| VICTIM'S NAME | DISTRICT        AREA | DATE OF THIS REPORT |
|---|---|---|
| RODRIGUEZ, ANTHONY | C4   3 | 30 Aug 1993 |

| DEFENDANT'S NAME | LABORATORY UNIT |
|---|---|
| | MICROSCOPY/TRACE UNIT |

### GUN SHOT RESIDUE ANALYSIS

On 03-07-93 TECH  P. MORAN 7718 of the Crime Laboratory

Mobile Unit submitted the following exhibit and control for analysis:

Exhibit W-1: Four (4) handswabs identified as having

been recovered from RODRIGUEZ, ANTHONY

Exhibit W-1 and control were analyzed using Atomic Absorption

Spectrophotometry for the elements lead, barium, and antimony

which are components of most gunshot residue mixtures.

The test results of kit 93-143  do not allow the analyst to

form an opinion regarding a firearm discharge.

Exhibit W-1, Inventory Number 1198252, will be forwarded to the

Evidence and Recovered Property Section.

Page 1 of 1

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) |
|---|---|
| 1 To Unit Area 2 VC | Scott A Kochowicz |
| DET. ARBATAITIS#20315 | SIGNATURE |
| | Scott A Kochowicz |

RD NO: X-342989

CPD-33 110 (9/89)

E-10

IV-11

**CRIME LABORATORY DIVISION/CHICAGO POLICE**

| INCIDENT/OFFENSE CLASSIFICATION | I-UCR OFF. CODE | RD NO |
|---|---|---|
| HOMICIDE / MURDER | 0110 | X342099 |

| VICTIM'S NAME | DISTRICT     AREA | DATE OF THIS REPORT |
|---|---|---|
| RODRIGUEZ, ANTHONY | 04  1  2 | 29 JUL 1993 |

| DEFENDANT'S NAME | LABORATORY UNIT |
|---|---|
|  | MICROSCOPY/TRACE UNIT |

## GUN SHOT RESIDUE ANALYSIS

On 29-07-93 TECH  P. MORAN 7718 of the Crime Laboratory

Mobile Unit submitted the following exhibit and control for analysis:

> Exhibit G-1: Four (4) handswabs identified as having
>
> been recovered from NEWELL, IAN

Exhibit G-1 and control were analyzed using Atomic Absorption

Spectrophotometry for the elements lead, barium, and antimony

which are components of most gunshot residue mixtures.

The test results of kit 93-142  do not allow the analyst to

form an opinion regarding a firearm discharge.

Exhibit G-1, Inventory Number 1198252, will be forwarded to the

Evidence and Recovered Property Section.

Page 1 of 1

| EXTRA COPIES REQUIRED (NO. & RECIPIENT) | REPORTING MEMBER (PRINT NAME) |
|---|---|
| 1 To Unit Area 2 VC  DET. ARBATAITIS#20315 | SCOTT A ROCHOWICZ |
| | SIGNATURE  Scott A Rochowicz |

CPD-33.110 (9/89)

CHICAGO POLICE DEPARTMENT    Homicide                    RD NO

| ADDRESS OF SERVICE | VICTIM'S NAME | SEX-RACE-AGE | AREA-DIST-BEAT |
|---|---|---|---|
| 13600 S. Calhoun | V-12 | | 04 |

ASSIGNMENT TYPE    CS    REQUESTED BY  0432    DATE RECEIVED - TIME  28 Jul 93-0450

PHOTOGRAPHY

- A O/A gravel area at 13600 S. Calhoun
- B O/A weapon on ground C/U
- C O/A Ford (lic/ RD 2488) C/U damage, rear side
- D O/A boat (IL 2776C) C/U damage, left side
- E ID Unk #1. C/U wound, right side chest
- F O/A tattoo right arm
- G ID Unk #2 C/U wounds, chest
- H

FINGERPRINTS    ELIM PRINTS ☐YES ☐NO    IN CUSTODY ☐YES ☐NO    NAME (LAST FIRST)    SEX-RACE - D O B    C.B NO

MED NEG LIFT  W    LOCATION FOUND  five shot revolver SR# 19938 (PH)    F N    MED NEG LIFT    LOCATION FOUND

Fingerprints photographed by John J. Miller #15765    1 - 4"x5"neg 28 Jul 93

POSSIBLE SUSPECT INFORMATION ☐MALE ☐FEMALE ☐ADULT ☐JUVENILE    RACE    TOTAL NO OF LIFTS    DATE OF TRANSMITTAL

☐PALMS ☐IMPRESSIONS ☐FINGERPRINTS    SUITABLE FOR COMPUTER ☐YES ☐NO    PRINTS SUITABLE FOR COMPARISON ☐YES ☐NO

VEH YEAR  MAKE & MODEL  Ford Taurus    COLOR  black    STATE LICENSE NO  RD 2488    VIN  1FACP53409G144895

PHYSICAL EVIDENCE

| PROP INVENT NO - UNIT | DESCRIPTION & LOCATION | INITA |
|---|---|---|
| 1198251  177 | one Iver Johnson 5 shot revolver, 1 1/2"bbl, chrome, SR# 19938; two 38 S&W discharged cartridge cases and three 38 S&W cartridges taken from the revolver at 13600 S. Calhoun. | PH |
| 1198252  177 | one AA GSR# 93-142 administered to Unk #1  one AA GSR# 93-143 administered to Unk #2 at Christ Community Hospital ER. | |

DETAILS OF CASE
At 13600 S. Calhoun R/T met Det. Bernatek who related that during a disturbance unknown person #1 (deceased) shot unknown person #2 (critical with GSWs to left chest, left arm and back). Person #1 was then shot by an as yet unknown third person. R/T photographed views depicting conditions of the scene and surrounding area, searched for and collected the noted physical evidence. Vehicles were examined that appeared to have been damaged in the gunfire exchange with negative results. At Christ Hospital, R/T examined and photographed views depicting the condition and wounds of both parties. AA GSR examinations were administered to both persons at the request of Bt 5212. Polaroid photos were taken and turned over to Bt 5212.

INVESTIGATING OFFICER'S NAME  Arbataitis #20315  Bernatek #20016  5212/522    BEAT OFFICER'S NAME  Busin    STAR NO  3004    UNIT  0432/004

REPORTING TECHNICIAN - PRINT LAST NAME - FIRST - STAR NO - UNIT  Patrick Moran #7713    Robert Baikie #3623  177    DATE ARRIVED  28 July 93 - 0510    TIME COMPLETED  1000

TECHNICIAN'S SIGNATURE    DATE  28 July 93    APPROVING SUPERVISOR (PRINT NAME) - STAR NO  -47-

CPD 1 949 (REV 10-92)



LOCATION OF WEAPON          (Ⅴ-13)

OFFICER  A. BUSIN

A. ..... PEOPLE WERE YELLING AND SCREAMING, AND
THEN THEY WERE ALSO POINTING THAT THE WEAPON WAS JUST
ABOUT 30 TO 35 FEET WEST IN THE PARKING LOT AREA FROM ~~MR. NEWELL~~
MR. NEWELL ———— (TR AT B-7)

    I WENT THERE WITH MY PARTNER, PLACED HER THERE TO
PROTECT THE GUN .... — (TR AT B-7)

    Q. ... A PEOPLES EXHIBIT #3 AND ASK IF YOU RECOGNIZE WHAT IT IS?
THE WITNESS:
        A. YES. THIS WAS THE HANDGUN THAT WAS  POINTED OUT TO US BY
SEVERAL PEOPLE STATING THAT THIS WAS A WEAPON THAT MR. NEWELL
    USED.  ——— (TR AT B-9)

MR. NICHOLS:  OBJECTION, JUDGE. (TR AT B-9)

THE COURT:  OVERRULED          (TR AT B-9)

MR. BERLIN:  Q. OFFICER, SO WE ARE CLEAR IS THAT THE GUN ... THAT
            WAS APPROX. 35 FEET ... TO THE WEST OFF JAN NEWELL

    THE WITNESS: A. — YES.

┌─────────────────────────
│ NOTE: PEOPLES EXHIBIT 3
│ WAS A PICTURE OF THE
│ IVER-JOHNSON GUN WHICH
│ WAS MY GUN <u>NOT</u> THE
│ WEAPON FOUND
└─────────────────────────

    Q. AND WERE THE CRIME LAB OFFICERS, WHAT THEY CALLED
       OUT TO THE SCENE AS WELL? — (TR AT B-9)
    A. YES ....
    Q. DID YOU SEE THEM DO ANYTHING WITH THAT GUN?
    A. THEY PICKED IT UP, PROCESSED IT, INVENTORIED WHICH
       EVER WAY THEY DO IT. — (TR AT B-9)


WITNESS  JEFF ADAMS

    A. VICTIM FELL .... THE SHOOTER ... STARTED TO WALK AWAY ...
       AND HE THREW THE REVOLVER UP IN THE AIR ... TOWARDS THE
       STREET LIGHT ... ——— (TR AT A-13)

    Q. SIR, I'M NEXT GOING TO SHOW YOU ... PEOPLES EXHIBIT NUMBER 3,
       FOR IDENTIFICATION, AND ASK IF YOU RECOGNIZE WHATS SHOWN



LOCATION OF WEAPON (CONT)

IN THAT PHOTOGRAPH? (TR AT A-17) IV-14

A. IT'S A REVOLVER

Q. AND IS THAT THE TYPE OF REVOLVER THAT YOU SAW IN DEFENDANTS HAND?

A. ABSOLUTELY

Q. DOES IT LOOK LIKE THE SAME REVOLVER?

A. IT CERTAINLY DOES. (TR AT A-17)

WITNESS BRANDY MORRISON

Q. THE DEFENDANT?

A. YEAH, HE COMES AROUND MY CAR AND HE THROWS THIS WEAPON AWAY.—(TR AT A-28)

A. ... HE JUST FLUNG HIS LEFT ARM UP.

WITNESS STAN WELICZKO

Q. NOW YOU LATER FOUND THE GUN THAT HAD BEEN THROWN AWAY?

Q. ... AND THE GUN WAS ABOUT 40 FEET AWAY ....

A. YES. ——(TR AT A-51)

QUESTIONS: IF THE WITNESSES SAW ME THROW THE IVER-JOHNSON HOW DID CRIME TECH'S FIND A SMITH & WESSON GUN? I BELIEVE THAT THE S&W WAS SUPPRESSED & WHEN THEY FOUND OUT THAT MY GUN WAS THE IVER-JOHNSON, THE PROSECUTION ALTERED REPORTS AND THE WITNESSES WEREN'T TOLD THAT ANOTHER GUN WAS FOUND.

MR. NICHOLS (MY PUBL/DEFNDR) NEVER MENTIONED ANYTHING ABOUT GUNS OR FORENSICS TO ME! NOR CHALLENGED THIS INFORMATION.

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

*V-15*

DATE OF ORIG. CASE REPORT
12 | Jul | 91

DATE OF THIS

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT

SEC/UNIT ASS

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.



136th COLH. RIVERSIDE LOWELE

RIVER

PARKING LOT

— 38 —

ING OFFICER'S SIGNATURE—STAR NO.  20315   RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO.  2163  DAY-MO-YR.  TIME
4 AUG 93  0727

122 (Rev. 2/83)

GROUNDS A & I ARE GROUPED TOGETHER

GROUND - IV - THAT PERJURED TESTIMONY WAS GIVEN BY
STAN WELICHO (EYEWITNESS), THE WITNESS DEEMED MOST
CREDIBLE BY THE JUDGE WHERE "IN" HIS STATEMENT HE
STATED HE DID NOT SEE THE SHOOTING, BUT AT TRIAL
TESTIFIED AS TO ACTUALLY SEEING NEWELL SHOOT THE
DECEASED AND THAT THIS WAS MORE THAN AN INCONSISTENCY.

GROUND V - INEFFECTIVE ASSISTANCE OF COUNSEL BY:
1) PUBLIC DEFENDER G. NICHOLS PRE-TRIAL, TRIAL, SENTENCING
( NEVER BROUGHT UP INTOXICATION AS MITIGATION )
2) TODD SHANKER ON DIRECT APPEAL
3) LORI MOSBY - ON APPEAL OF POST-CONVICTION

(SUPPORTING DOCUMENTS FOLLOW)
NUMBERED - I
↓
III - 6-11, II-12

III-6

E-8

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

DATE OF ORIG. CASE REPORT
DAY  MONTH  YEAR
28  Jul  93

DATE OF THIS REP.
DAY  MONTH  YEAR
29  Jul  93

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT    VICTIM'S NAME AS SHOWN ON CASE REPORT    BEAT/UNIT ASSIG.
Homicide    Vargas Anthony    5211

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

ASA DURKIN AT A/2 1900 HRS.

STAN

(2) GIRLS FIGHTING BLOND +
BRUNET

outside of Bar

~~[crossed out]~~

~~[crossed out]~~

TONY + JAN ARE BREAKING
UP THE GIRLS

(TONY KICKS JAN IN CHEST)

AFTER JAN GETS UP HE
WALKS AWAY TOWARDS THE ????

LATER HE HEARS A SHOT
+ SEES TONY FALL FACE DOWN + SEES
JAN WITH A GUN

(OVER)

REPORTING OFFICER'S SIGNATURE—STAR NO.    20315    RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO.    #2163    DAY-MO.-YR. TIME    4 AUG 93 PM

CPD 73.122 (Rev. 2/83)

38

NOTE:  EYEWITNESS   RICK RODRIGUEZ  WAS NEVER
INVESTIGATED BY ASST. P/D G.NICHOLS. - HE GAVE AN
ENTIRELY DIFFERENT VERSION OF EVENTS THAN THE
STATE'S EYEWITNESSES (SECT. IV pt. 4), WHERE
ANOTHER PERSON (GEARY) WAS ON A BIKE FIRING AT THE
SCENE. (IV-4) (IV-6)

    IN STAN WELICZO'S STATEMENT TO ASST. STS. ATTY.
JAMES DURKIN, WELICZO BEGINS TO RELATE THE INCIDENT OF
SOMEONE ON A ____ le ... SAW THE GUY ON A ... BUT
IS IMMEDIATELY CORRECTED BY MR. DURKIN, SEE STATEMENT
OF STAN WELICZO (III-8 MIDDLE OF PG.)
    - STAN WELICZO WAS THE WITNESS MOST RELIED ON BY
JUDGE AS MOST RELIABLE -(III-9 OR TR-B-35)

THIS WAS THE WITNESS WHO TESTIFIED AT TRIAL THAT HE SAW THE SHOOTING

AND WAS THE WITNESS THE STATE RELIED ON AS MOST CREDIBLE SEE TRIAL TRANSCRIPTS AT B 35, 36

**E-5**

STATEMENT OF SWW

## Stan Webiczko

Taken 7-29-93    At 8:15 PM

At 22 Violent Crimes

Present ASA Durkin

Det Arbataitis 20315

(III-7)

This statement taken regarding the Fatal Shooting

of Tony Rodriguez which occurred on July 28, 1993

at 13600 S. Calhoun Chicago at 0400 hours.

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

NRGD SWW
Stan Webiczko

After being advised and stating that he understood that James Durkin was an assistant States Attorney a lawyer and prosecutor and not Joseph Majka nor Jan Newell's Lawyer. STAN NRGW SWW Webiczko agreed to the following statement in summary. He states he graduated from Fenger High School in 1970. He states he can read and write English. He states he does not know Jan Newell or Joseph Majka. He states that he arrived at the Riverside Lounge with Les Hector Jon RfGW SWW and Mary and NRG SWW Jeff. He states he was August Fest that evening in Hammond with Les Hector then met Mary and Jeff at D.J's Lounge prior to arriving at the Riverside Lounge. He states that after arriving at the Riverside, approximately fifteen minutes later he saw two girls fight in the parking lot. One

James Durkin ASA          Stan Webiczko — SWW NRGW

(11)

girl was a blonde with blue jeans long black boots
And a black T-shirt the other woman is a brunette
heavy set with shorts. He states he that two males
a middle-aged hispanic and an older middle aged man
with brown glasses and long shorts intervened with
the girls. He states he Next saw the hispanic drop kick
the guy with the brown glasses and shorts He states
the guy with the glasses hit the ground and walk
towards the River He states the girls began to fight
Again He states about 45 minutes to a hour later he
was sitting on a picnic bench watching Volleyball. He
States the Hispanic male was sitting about 10-15 feet from
him. He states he he heard a gun shot looked up
and saw the Hispanic guy fall down and the
guy with the brown glasses And shorts with a gun in
his hand in front of the Hispanic male. He states
the guy with the gun walked through a hole in the fence
He states he went to help the guy who was shot and
about a minute later he saw in his late twenties shoot
A gun, about 5-6 shots, in a north east direction. He states
he never saw that man before and he was Not the
same man who shot the Hispanic man earlier.
He states that he saw the guy who shot the Hispanic
man laying on the dirt in an east direction the same
direction the male in the parking lot was aiming his gun He
states the guy in the dirt with blood on his head and
Shoulder.

(12)

1    She heard the shots. She couldn't

2    testify -- if she was going to embellish anything she

3    certainly had the ability to embellish. She didn't.

4    She only heard the shooting, didn't see it. The most

5    objective testimony in the case is from Stanley

6    however you pronounce his last name.

7    MR. BERLIN:   Wolichko.

8    THE COURT:   The Inland Steel worker who had

9    never been to the bar, hasn't been back in the bar

10   since according to him. He's an independent witness

11   who has no bias on either side, an eyewitness who

12   comes upon the scene. He testifies he sees the

13   initial fight.

14   Tony is dropped kicked by the defendant

15   and -- not drop kicked. The Defendant Jan and knocks

16   him down. Then he testifies he saw nothing happen.

17   For about a half hour nothing happened. During that

18   time he sees the defendant within about twenty minutes

19   later. He testifies he sees the defendant walk up to

20   Tony, pull out the gun and roughly between a period of

21   twenty minutes and half hour maybe as long as

22   forty-five minutes certainly a substantial cooling-off

23   period in which the defendant leaves, gets his gun.

24   Oh, he has the gun all right. I don't

*(margin note left of lines 3–6:)* THIS PG. IS JUDGE'S CONCLUSION

*(margin note left of lines 18–20:)* DIFFERS FROM STATE MEM

III-10

1    know.   Makes up his mind, comes back to the scene.   He

2    has a gun and confronts a man who puts his palms up

3    and steps backwards.   Had there been a fight before,

4    if he had shot him in the course of the original fight

5    and shot the unarmed man during the course of that

6    original confrontation I would have agreed with the

7    defense there would be an argument for sudden and

8    intense passion and perhaps a finding of murder two in

9    this case.

*AGAIN BASES ON THIS WITNESS PERJURY*

10              Mr. Wolichko testifies the victim put up

11   his arms and had nothing in his hands.   The next

12   witness, George Miller, also testified he saw the

13   defendant come out of his pocket a with a gun and

14   shoot the victim.   The victim had nothing in his

15   hands.

16              There appears to be nothing in this

17   record to corroborate any sudden and intense passion.

18   Indeed what the record bears out is someone who gets

19   in a confrontation, leaves, makes a decision, the

20   decision is indicated by his actions, his words, "Do

21   you want to die, mother; or do you want to die, mother

22   fucker?"

23              There's no other clearer intentions of

24   someone of their own words or actions here.   The



1    MR. NICHOLS: Judge, we have heard testimony from

2    witnesses who viewed this event from twenty feet away,

3    from inside the bar looking out at the event, and they

4    describe to you a shooting that happened while the

5    defendant and the decedent in this case were toe to

6    toe, were three feet away from each other.

7              From their vantage point, Judge, it

8    appeared that there was nothing in the decedent's

9    hand.  The decedent did not appear to be threatening

10   to them, but they were in a different position than

11   the defendant was because the defendant being closer

12   to him having just been dropped kicked by him.

13             You remember that two of the witnesses

14   testified that the decedent in this case had just drop

15   kicked the defendant to the ground and had rubbed his

16   face in the gravel.  The defendant was in quite a

17   different position.  The defendant was in fear for his

18   life, Judge, and Judge, I think that you can only find

19   the defendant not guilty at this time.  He was acting

20   only in self-defense.

21      THE COURT: Motion for a directed finding will be

22   denied.

23      MR. NICHOLS: Judge, I will call Mr. John

24   Pivorunias.

B 22

INEFFECTIVE ASSISTANCE OF COUNSEL

J. Nichols A-53668
# 93 CR 14970

**I.** GEORGE NICHOLS (ASST. P/D AT TRIAL) — CONCEDED GUILT

JUDGE, HIS ACT WAS AN ACT OF SELF-DEFENSE AND WAS A RESULT OF A SUDDEN AND INTENSE PASSION. JUDGE, IN THIS CASE ALTHOUGH A MURDER FINDING MAY BE WARRANTED, THAT FINDING SHOULD ONLY BE MURDER IN THE SECOND DEGREE. (TR AT B-31)

[ FAILURE TO PRESENT FORENSIC EVIDENCE OF REASONABLE DOUBT / FACTUAL INNOCENCE / MITIGATION / ADVERSARIAL TESTING ]

ALSO: "JUDGE, IT'S CLEAR IN THIS CASE, JUDGE, THAT MY CLIENT ACTED BOTH IN SELF-DEFENSE AND AS WELL AS A RESULT OF PROVOCATION"

(TR AT B-30)

**II.** TODD SHANKER (ASST. P/D ON DIRECT APPEAL)

NEVER CONSULTED WITH DEFENDANT. DEFENDANT RECEIVED LETTER SHOWING THAT HE WAS APPOINTED ON FRIDAY AND HIS BRIEF WAS FILED THE FOLLOWING MONDAY. DID NOT ADDRESS PRO SE SUPPLEMENTAL BRIEF WHICH HAD BEEN GRANTED BY COURT. — ONLY RAISED EXCESSIVE SENTENCE ISSUE.

**III.** LORI MOSBY (ASST. APPELLATE DEFENDER ON POST CONVICTION APPEAL)

RAISED ONLY ONE ISSUE — PROMISE OF 2ND DEGREE WITH A BENCH TRIAL — I NOTIFIED HER BY MAIL OF OTHER ISSUES

WAS THE GIST OF A MERITORIOUS ISSUE

FAILED TO RAISE INEFFECTIVE ASSISTANCE OF COUNSEL WITH AVAILABLE EVIDENCE

(C)  Ground three _____
Supporting facts: _____

_____

_____

_____

_____

_____

_____

_____

(D)  Ground four _____
Supporting facts: _____

_____

_____

_____

_____

_____

_____

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

YES ( )  NO (✓)

3.  If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

THE DENIAL OF JURY TRIAL WITH A FALSE PROMISE OF 2ND DEGREE, WITH A BENCH TRIAL, WAS EXHAUSTED. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSELS PREVENTED ALL CLAIMS FROM EXHAUSTION. INCLUDED IS "NEW" EVIDENCE REQUIRING REVIEW UNDER THE "FUNDMENTAL MISCARRIAGE OF JUSTICE" STANDARD. THE CENTRAL CORE OF CLAIMS WAS INCLUDED AS EXHIBITS BUT NOT ARTICULATED DUE TO BEING PRO-SE & WITHOUT LEGAL EXPERTISE.

Revised: 7/20/05

**PART IV – REPRESENTATION**

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _GEORGE NICHOLS – ASST. PUBLIC DEFENDER_

(B) At arraignment and plea ___"____""_____"_____"_____"_____

(C) At trial _____"_____"_____"_____"_____"_____

(D) At sentencing _____"_____""_____"_____"_____"_____

(E) On appeal _____TODD SHANKER – ""____""_____"_____

(F) In any post-conviction proceeding _LORI MOSBY – ASST. APPELLATE DEFENDER ON APPEAL OF POST-CONVICTION DENIAL_

(G) Other (state): _____DEBRA SEATON (CHICAGO) COURT APPOINTED ON APPEAL OF MOTION TO BE HEARD CONSTRUED AS A SUCCESSIVE 2-1401 PETITION (RELIEF FROM JUDGEMENT)_

**PART V – FUTURE SENTENCE**

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )    NO (✓) _____SHOBHA MAHADEV (ASST. APPELLATE DEFENDER) ON APPEAL OF ORIGINAL 2-1401 PETITION_

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

    WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _JUNE 17, 2008_
(Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_J. Newell_
(Signature of petitioner)

_K-50566_
(I.D. Number)

_DIXON CORR. CNTR – 2600 N. BRINTON_
(Address)      _DIXON, IL 61021_

Revised: 7/20/05

STATE OF ILLINOIS

          SS

~~COUNTY OF LEE~~

LEE COUNTY      IN THE

UNITED STATES DISTRICT COURT NORTHERN
DISTRICT OF ILLINOIS - WESTERN DIVISION

JAN NEWELL      )
      Respondent      )
     vs.            )      Case No._____
NEDRA CHANDLER - WARDEN   )

**NOTICE OF FILING**

20TH FL - CLERKS OFFICE - PRISONER CORRESP.   CHIEF CRIMINAL APPEALS DIVISION

To: U.S. DISTRICT CT. - EASTERN DIV.   To: OFFICE OF ATTY. GENERAL   To:

219 S. DEARBORN ST.      100 W. RANDOLPH - 12TH FL.      _____

CHICAGO, IL 60604      CHICAGO, IL 60601      _____

1 original & **2** copies      **1** copy(ies)      _____ copy(ies)

PLEASE TAKE NOTE that on the **19TH** day of **JUNE**_____, 20**08**, I have
filed, through the U.S. Mail, the above named parties; the below listed documents
(number of copies & originals filed are listed below the addresses of the parties):

1. _PETITION FOR WRIT OF HABEAS CORPUS_____
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____
8. _____

**AFFIDAVIT OF SERVICE**

I, _JAN NEWELL_____, being first duly sworn on oath, depose and aver
that he/she has caused the above stated documents in the above stated amounts, to be
served upon the above listed parties by placing the same in the U.S. Mail Box on Housing
Unit **HCU** located at Dixon Correctional Center in Dixon, IL for delivery as 1st Class
Mail.

s/s _Jan Newell_____
Name: _JAN NEWELL_____
IDOC Reg. # _K-50566_____

Subscribed and sworn to before me this

_19th_ day of _June_____, 20_08_.

_Carole S. O'Neal_
Notary Public

"OFFICIAL SEAL"
Carole S. O'Neal
Notary Public, State of Illinois
My Commission Exp. 07/31/20██